[No. S026393. July 26, 1993.]

DANIEL THOR, Petitioner, v.
THE SUPERIOR COURT OF SOLANO COUNTY, Respondent;
HOWARD ANDREWS, Real Party in Interest.

COUNSEL

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Kenneth C. Young, Assistant Attorney General, Bruce M. Slavin, Morris Lenk, George D. Prince and Robert R. Granucci, Deputy Attorneys General, for Petitioner.

No appearance for Respondent.

Steven Fama, under appointment by the Supreme Court, for Real Party in Interest.

Catherine I. Hanson and Alice P. Mead as Amici Curiae.

OPINION

ARABIAN, J.—More than a century ago, the United States Supreme Court declared, "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law. . . . 'The right to one's person may be said to be a right of complete immunity: to be let alone.' [Citation.]" (*Union Pacific Railway Co.* v. *Botsford* (1891) 141 U.S. 250, 251 [35 L.Ed. 734, 737, 11 S.Ct. 1000].) Speaking for the New York Court of Appeals, Justice Benjamin Cardozo echoed this precept of personal autonomy in observing, "Every human being of adult years and sound mind has a right to determine what shall be done with his own body . . . ." (*Schloendorff* v. *Society of New York Hospital* (1914) 211 N.Y. 125 [105 N.E. 92, 93], overruled on other grounds in *Bing* v. *Thunig* (1957) 2 N.Y.2d 656 [163 N.Y.S.2d 3, 143 N.E.2d 3].) And over two decades ago, Justice Mosk reiterated the same principle for this court: "[A] person of adult years and in sound mind has the right, in the exercise of control over his body, to determine whether or not to submit to lawful medical treatment." (*Cobbs* v. *Grant* (1972) 8 Cal.3d 229, 242 [104 Cal.Rptr. 505, 502 P.2d 1].)

Although seemingly categorical, these pronouncements predate the recent rapid advancements in medical technology with their attendant ethical, moral, and social implications. Illnesses and injuries that once brought the clergy to the bedside of the afflicted now may bring a team of highly skilled medical personnel fully equipped with sophisticated, life-preserving machinery. Increasingly, the courts are drawn into the wake of this technological progress to mediate among the myriad concerns it has generated.

Here, we must determine whether the right to "exercise of control over [one's] body" is sufficiently broad to permit an individual to decline life-sustaining treatment, even if to do so will cause or hasten death. Drawing upon the wisdom and insight of the courts preceding us into this sensitive territory, we approach our undertaking with caution and humility, fully appreciative of the profound considerations, both philosophical and personal, at issue. After due deliberation, we hold that under California law a competent, informed adult has a fundamental right of self-determination to refuse or demand the withdrawal of medical treatment of any form irrespective of the personal consequences. Under the facts of this case, we further conclude that in the absence of evidence demonstrating a threat to institutional security or public safety, prison officials, including medical personnel, have no affirmative duty to administer such treatment and may not deny a person incarcerated in state prison this freedom of choice. (Pen. Code, § 2600.)

## I.

Real party in interest Howard Andrews (Andrews) is confined to the California Medical Facility at Vacaville serving a life term. On May 24, 1991, Andrews jumped or fell from a wall while in prison, fracturing a cervical vertebrae and rendering himself a quadriplegic. As a result, he lacks any physical sensation or control of his body below the shoulders. The condition is irreversible. Medical personnel must assist in the performance of all bodily functions, and Andrews must cooperate with them during his feeding and the administration of medication.

Petitioner Daniel Thor (petitioner) is a licensed physician attending Andrews as a staff member of the medical facility at Vacaville. Petitioner alleges that since October 11, 1991, Andrews "has intermittently refused to be fed," causing severe weight loss and threatening his health. He also has refused necessary medication and treatment for his general care. Consequently, he is at substantial risk of death due to possible pulmonary emboli, starvation, infection, and renal failure. Staff psychiatrists have examined Andrews and found him depressed about his quadriplegic condition but mentally competent to understand and appreciate his circumstances.

On November 22, 1991, petitioner initiated an ex parte proceeding in the superior court seeking an order allowing him to use a gastrojejunostomy tube or percutaneous gastrostomy tube to feed and medicate Andrews notwithstanding his refusal to consent to such procedures.[1] The court ruled as a matter of law that Andrews had a right to refuse medical intervention under the facts alleged. ▮▮▮ Petitioner sought a writ of mandate in the Court of Appeal, which appointed counsel for Andrews and solicited responsive pleadings. Counsel filed a demurrer and answer, admitting the substance of the factual allegations, but asserting Andrews's right to make decisions regarding his care and treatment and denying any intention to engage in a hunger strike as alleged by petitioner.[2]

The Court of Appeal summarily denied the petition but provided a statement of reasons. Relying on *Bouvia* v. *Superior Court* (1986) 179 Cal.App.3d 1127 [225 Cal.Rptr. 297] (*Bouvia*) and *Bartling* v. *Superior Court* (1984) 163 Cal.App.3d 186 [209 Cal.Rptr. 220] (*Bartling*), the court concluded Andrews "had a right to refuse unwanted medical treatment, including sustenance." We granted review to address these transcendent issues of statewide importance.[3]

## II.

▮▮▮ Petitioner posits a duty to force-feed and provide other nonconsensual treatment as he deems appropriate and necessary because, although competent, Andrews is subject to his custodial care as a state

---

[1] A "gastrojejunostomy" is "[a] surgical operation for the creation of an anastomosis (artificial communication) between the stomach and the jejunum [forming a bypass for food]. The jejunum is the second part of the small intestine, separated from the stomach by the intervening duodenum." (2 Schmidt, Attorneys' Dict. of Medicine (1991) p. G-25.) A "gastrostomy" is "[t]he surgical cutting of an opening into the stomach wall through the wall of the abdomen, usually in order to create a channel for artificial feeding . . . ." (*Id.*, at p. G-27.)

[2] The ex parte and summary nature of the hearing below, which does not appear to have been precipitated by any actual emergency, has somewhat constrained our analysis in part for lack of a thorough exposition of the facts. The informality of the procedures did more than potentially compromise the record for review, however: it denied fundamental due process. The unnecessary exclusion of *the* critical party from meaningful participation in a determination of his right to direct the course of medical treatment contravenes the basic tenets of our judicial system and affronts the principles of individual integrity that sustain it.

Accordingly, except in cases of imminent danger to the life or health of the patient or a similar exigency, we disapprove any procedure that denies or limits any relevant party access to the proceedings and the opportunity to be heard. In the event such denial or limitation has occurred and thereby impaired review, an appellate court may remand the matter for amplification of the record to safeguard the interests of all concerned.

[3] This court also issued a stay order authorizing, on an emergency basis, nonconsensual medical treatment if necessary to prevent Andrews's death pending resolution.

prisoner.[4] (*Estelle* v. *Gamble, supra,* 429 U.S. at p. 104 [50 L.Ed.2d at p. 260]; Cal. Code Regs., tit. 15, § 3351.) Unless permitted to provide such care, petitioner fears he could be subject to possible civil and criminal liability. Andrews counters that regardless of his status he has the right to refuse treatment even if the refusal may hasten his death, and his decision must prevail over any interest asserted by petitioner. (See generally *Bouvia, supra,* 179 Cal.App.3d 1127.)

Penal Code section 2600 provides in part that a prisoner "may . . . be deprived of such rights, and only such rights, as is necessary in order to provide for the reasonable security of the institution in which he is confined and for the reasonable protection of the public." Accordingly, to resolve this conflict we must initially remove it from the prison context and determine whether Andrews would otherwise have the right to prevent petitioner from administering any medical procedure to which he has not consented, irrespective of the personal consequences.

## A.

Until recently, the question of a patient's right to refuse life-sustaining treatment has implicated potentially conflicting medical, legal, and ethical considerations. The developing interdisciplinary consensus, however, now uniformly recognizes the patient's right of control over bodily integrity as the subsuming essential in determining the relative balance of interests. (See *In the Matter of Farrell* (1987) 108 N.J. 335 [529 A.2d 404, 410-412] and cases cited.) This preeminent deference derives principally from "the long-standing importance in our Anglo-American legal tradition of personal autonomy and the right of self-determination." (*In re Gardner* (Me. 1987) 534 A.2d 947, 950; see *Rasmussen* v. *Fleming* (1987) 154 Ariz. 207

---

[4]Preliminarily, we note the question of petitioner's standing to seek an order permitting nonconsensual medical treatment under these facts. Petitioner asserts that he has a duty arising under both California regulatory authority and the federal Constitution to administer any procedure necessary to maintain the health of prisoners within his care, including Andrews, and that the failure to discharge this duty could subject him to various liabilities. (See Cal. Code Regs., tit. 15, § 3351 ["Medical treatment, including medication, will not be forced over the objections of a mentally competent inmate . . . except when immediate action is necessary to save the life or avoid serious physical damage to an inmate."]; *Estelle* v. *Gamble* (1976) 429 U.S. 97, 104 [50 L.Ed.2d 251, 260, 97 S.Ct. 285] ["deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' [citation] proscribed by the Eighth Amendment."].)

As we explain subsequently, neither administrative regulation nor the Eighth Amendment authorizes prison officials to disregard a competent prisoner's refusal to consent to medical treatment. (See, *post,* pt. III.B. and fn. 15.) Nevertheless, we find that petitioner's concern for a judicial determination of his duty in these circumstances justifies resolution by this court. (Cf. Code Civ. Proc., § 525 et seq. [injunctive relief], 1138 [declaratory relief]; *Donaldson* v. *Lungren* (1992) 2 Cal.App.4th 1614 [4 Cal.Rptr.2d 59].)

[741 P.2d 674, 682-683]; *Satz* v. *Perlmutter* (Fla.Dist.Ct.App. 1978) 362 So.2d 160, 162, affd. (1980) 379 So.2d 359; *Brophy* v. *New England Sinai Hospital, Inc.* (1986) 398 Mass. 417 [497 N.E.2d 626, 633] (*Brophy*); *In the Matter of Farrell, supra*, 108 N.J. 335 [529 A.2d at p. 410].) As John Stuart Mill succinctly stated, "Over himself, over his own body and mind, the individual is sovereign." (Mill, On Liberty (1859) p. 13.)[5]

■ The common law has long recognized this principle: A physician who performs any medical procedure without the patient's consent commits a battery irrespective of the skill or care used. (*Estrada* v. *Orwitz* (1946) 75 Cal.App.2d 54, 57 [170 P.2d 43]; *Valdez* v. *Percy* (1939) 35 Cal.App.2d 485, 491 [96 P.2d 142]; *Schloendorff* v. *Society of New York Hospital, supra*, 211 N.Y. 125 [105 N.E. at p. 93]; see *Union Pacific Railway Co.* v. *Botsford, supra*, 141 U.S. at p. 252 [35 L.Ed.2d at pp. 737-738]; *Mohr* v. *Williams* (1905) 95 Minn. 261 [104 N.W. 12, 14-15], overruled on other grounds in *Genzel* v. *Halvorson* (1957) 95 Minn. 261 [80 N.W.2d 854, 859]; Prosser on Torts (4th ed. 1971) § 18, pp. 104-106; Rest.2d Torts, § 49.) As a corollary, the law has evolved the doctrine of informed consent. (See *Cobbs* v. *Grant, supra*, 8 Cal.3d at pp. 239-241.) "Under this doctrine, 'the patient must have the capacity to reason and make judgments, the decision must be made voluntarily and without coercion, and the patient must have a clear understanding of the risks and benefits of the proposed treatment alternatives or nontreatment, along with a full understanding of the nature of the disease and the prognosis.' [Citations.]" (*Rasmussen* v. *Fleming, supra*, 154 Ariz. 207 [741 P.2d at p. 683].)

While the physician has the professional and ethical responsibility to provide the medical evaluation upon which informed consent is predicated, the patient still retains the sole prerogative to make the subjective treatment decision based upon an understanding of the circumstances. (*In re Gardner, supra*, 534 A.2d at p. 951; *In the Matter of Conroy* (1985) 98 N.J. 321 [486 A.2d 1209, 1222, 48 A.L.R.4th 1].) Accordingly, the right to refuse medical

---

[5]See also *Cruzan* v. *Director, Missouri Dept. of Health* (1990) 497 U.S. 261, 343 [111 L.Ed.2d 224, 282, 110 S.Ct. 2841] (dis. opn. of Stevens, J.) ("[T] the constitutional protection for the human body is surely inseparable from concern for the mind and spirit that dwell therein."); *id.*, at pages 279, 287-289 (conc. opn. of O'Connor, J.), 304-306 (dis. opn. of Brennan, J.) [111 L.Ed.2d at pages 242, 247-248, 258-260]; *Schmerber* v. *California* (1966) 384 U.S. 757, 767 [16 L.Ed.2d 908, 917, 86 S.Ct. 1826] ("The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State."); *Olmstead* v. *United States* (1928) 277 U.S. 438, 478 [72 L.Ed. 944, 956, 48 S.Ct. 564, 66 A.L.R. 376] (dis. opn. of Brandeis, J.) ("The makers of our Constitution . . . conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized man."); cf. *Stanley* v. *Georgia* (1969) 394 U.S. 557, 565 [22 L.Ed.2d 542, 550, 89 S.Ct. 1243] ("Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds.").

treatment is equally "basic and fundamental" and integral to the concept of informed consent.[6] (*Bouvia, supra,* 179 Cal.App.3d at p. 1137; *Bartling, supra,* 163 Cal.App.3d at p. 195; *Cruzan* v. *Director, Missouri Dept. of Health, supra,* 497 U.S. at p. 277 [111 L.Ed.2d at p. 241]] (*Cruzan*); *In re Gardner, supra,* 534 A.2d at p. 951; *Brophy, supra,* 398 Mass. 417 [497 N.E.2d at p. 633]; *In the Matter of Conroy, supra,* 98 N.J. 321 [486 A.2d at p. 1222].) "The purpose underlying the doctrine of informed consent is defeated somewhat if, after receiving all information necessary to make an informed decision, the patient is forced to choose only from alternative methods of treatment and precluded from foregoing all treatment whatsoever." (*Rasmussen* v. *Fleming, supra,* 154 Ariz. 207 [741 P.2d at p. 683].) "Obviously, if a patient is powerless to decline medical treatment upon being properly informed of its implications, the requirement of consent would be meaningless." (*McKay* v. *Bergstedt* (1990) 106 Nev. 808 [801 P.2d 617, 621]; see Cal. Code Regs., tit. 22, § 70707, subd. (6) [under administrative regulations patients have right to "[p]articipate actively in decisions regarding medical care. To the extent permitted by law, this includes the right to refuse treatment."].)

 Because health care decisions intrinsically concern one's subjective sense of well-being, this right of personal autonomy does not turn on the wisdom, i.e., medical rationality, of the individual's choice. (*Lane* v. *Candura* (1978) 6 Mass.App. 377 [376 N.E.2d 1232, 1236, 93 A.L.R.3d 59]; *In re Gardner, supra,* 534 A.2d at p. 951; see also *Bouvia, supra,* 179 Cal.App.3d at p. 1143.) "Anglo-American law starts with the premise of thorough-going self determination. It follows that each man is considered to be master of his own body, and he may, if he be of sound mind, expressly prohibit the performance of life-saving surgery, or other medical treatment. A doctor might well believe that an operation or form of treatment is desirable or necessary, but the law does not permit him to substitute his own judgment for that of the patient by any form of artifice or deception."[7] (*Natanson* v. *Kline* (1960) 186 Kan. 393, 406-407 [350 P.2d 1093, 1104].)

[6]Supreme courts in several sister jurisdictions also have concluded that their state constitutional rights of privacy encompass the right to refuse life-saving medical treatment. (See, e.g., *Rasmussen* v. *Fleming, supra,* 154 Ariz. 207 [741 P.2d at p. 682], and cases cited at p. 682, fn. 8 [Arizona]; *Satz* v. *Perlmutter, supra,* 379 So.2d at p. 360 [Florida]; *Hondroulis* v. *Schuhmacher* (La. 1989) 553 So.2d 398, 415 [Louisiana]; *In the Matter of Quinlan* (1976) 70 N.J. 10 [355 A.2d 647, 663] [New Jersey]; *In the Matter of Welfare of Colyer* (1983) 99 Wn.2d 114 [660 P.2d 738, 742] [Washington]; cf. *Bouvia, supra,* 179 Cal.App.3d at p. 1137.)

[7]Then Circuit Judge Warren Burger clearly explicated this concept in his opinion on the denial of rehearing in *Application of President & Directors of Georgetown Col.* (D.C. Cir. 1964) 331 F.2d 1010 [118 App.D.C. 90]: "Mr. Justice Brandeis, whose views have inspired much of the 'right to be let alone' philosophy, said in Olmstead v. United States . . . : 'The makers of our Constitution . . . sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be

Moreover, in this regard both courts and commentators generally reject attempts to draw distinctions between, for example, "ordinary" and "extraordinary" procedures,[8] or "terminal" and "nonterminal" conditions,[9] or "withholding" and "withdrawing" life-sustaining treatment. (See generally, President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, Rep. (President's Com., Rep.) (1983) Deciding to Forego Life-Sustaining Treatment, pp. 60-90.) Rather, effectuating the patient's freedom of choice remains the ultimate arbiter. (*In re Gardner, supra,* 534 A.2d at p. 955; cf. Health & Saf. Code, § 7191.5, subd. (e) ["This chapter [Natural Death Act] does not affect the right of a patient to make decisions regarding use of life-sustaining treatment, so long as the patient is able to do so, or impair or supersede a right or responsibility that a person has to effect the withholding or withdrawal of medical care."].)

Other, nonlegal sources uniformly reaffirm these tenets. Reports by the presidential commission studying these interrelated issues emphasize the necessity and value of personal autonomy with respect to both informed consent generally (President's Com., Rep. (1982) Making Health Care Decisions, pp. 43-51) and decisions to forego life-sustaining treatment (President's Com., Rep., *supra,* Deciding to Forego Life-Sustaining Treatment, pp. 2-4, 23-41). In a publication discussing the termination of such procedures, the Hastings Center, which devotes itself to the research of ethical problems in medicine, biology, and the life sciences, stated: "[O]ur ethical framework draws on the value of patient autonomy or self-determination, which establishes the right of the patient to determine the nature of his or her own medical care. This value reflects our society's long-standing tradition of recognizing the unique worth of the individual. We respect human dignity by granting individuals the freedom to make choices in accordance with their

---

let alone—the most comprehensive of rights and the right most valued by civilized man.' Nothing in this utterance suggests that Justice Brandeis thought an individual possessed these rights only as to *sensible* beliefs, *valid* thoughts, *reasonable* emotions, or *well-founded* sensations. I suggest he intended to include a great many foolish, unreasonable and even absurd ideas which do not conform, such as refusing medical treatment even at great risk." (*Id.,* at pp. 1016-1017; cf. Huxley, Brave New World (1960) p. 163.)

[8]See, e.g., *Bouvia, supra,* 179 Cal.App.3d at page 1137; *Barber* v. *Superior Court* (1983) 147 Cal.App.3d 1006, 1016-1017 [195 Cal.Rptr. 484, 47 A.L.R.4th 1] *(Barber); Cruzan, supra,* 497 U.S. at page 288 [111 L.Ed.2d at page 248] (conc. opn. of O'Connor, J.); *Brophy, supra,* 497 N.E.2d at page 637; *In the Matter of Conroy, supra,* 98 N.J. 321 [486 A.2d at pages 1233-1236].

[9]See, e.g., *Bouvia, supra,* 179 Cal.App.3d at pages 1139-1140; *Bartling, supra,* 163 Cal.App.3d at page 193; *In the Matter of Conroy, supra,* 98 N.J. 321 [486 A.2d at page 1226]; see also *Brophy, supra,* 497 N.E.2d 626; *Commissioner of Correction* v. *Myers* (1979) 379 Mass. 728 [399 N.E.2d 452] *(Myers); McKay* v. *Bergstedt, supra,* 801 P.2d 617. In this context, "terminal" refers to patients whose underlying condition is likely to cause death within a relatively short period, generally six months or less, with or without medical intervention. (See, e.g., Health & Saf. Code, § 7186, subd. (j).)

own values. The principle of autonomy is the moral basis for the legal doctrine of informed consent, which includes the right of informed refusal." (Hastings Center, Guidelines on the Termination of Life-Sustaining Treatment and the Care of the Dying (1987) p. 7; see also *Bouvia, supra,* 179 Cal.App.3d at pp. 1140-1141 [citing medical association statements affirming the preeminence of patient autonomy].)

Given the well- and long-established legal and philosophical underpinnings of the principle of self-determination, as well as the broad consensus that it fully embraces all aspects of medical decisionmaking by the competent adult, we conclude as a general proposition that a physician has no duty to treat an individual who declines medical intervention after "reasonable disclosure of the available choices with respect to proposed therapy [including nontreatment] and of the dangers inherently and potentially involved in each." (*Cobbs* v. *Grant, supra,* 8 Cal.3d at p. 243.) The competent adult patient's "informed refusal" supersedes and discharges the obligation to render further treatment.

## B.

■ Having reached this conclusion, we nevertheless recognize that, while fundamentally compelling, the right to be free from nonconsensual invasions of bodily integrity is not absolute. Four state interests generally identify the countervailing considerations in determining the scope of patient autonomy: preserving life, preventing suicide, maintaining the integrity of the medical profession, and protecting innocent third parties. (*Bouvia, supra,* 179 Cal.App.3d at p. 1142; *Brophy, supra,* 497 N.E.2d at p. 634; *In the Matter of Conroy, supra,* 98 N.J. 321 [486 A.2d at p. 1223].) ■ ■
■ In this case, petitioner asserts that all four undergird his duty to treat Andrews and therefore prevail despite the lack of consent.[10]

■ The state's paramount concern is the preservation of life, which embraces two separate but related aspects: an interest in preserving the life of the particular patient and an interest in preserving the sanctity of all life. In this context, however, these considerations can only assert themselves at

---

[10]Because they are denominated "state" interests, the question may arise whether petitioner has standing to assert them as an individual physician. Generally in these cases, the countervailing concerns are considered in the context of determining the scope of the patient's right to assert self-determination in the context of a given medical decision. This case assumes a somewhat different procedural posture. However, in light of petitioner's contention that these state interests reinforce an affirmative duty to administer medical treatment despite the lack of consent and that he may be civilly or criminally liable for not doing so, we find he may assert them in support of his position. The fact that the state, as petitioner's employer, would bear ultimate liability for his action or inaction further confirms the propriety of considering them in fully resolving all relevant issues.

the expense of self-determination and bodily integrity, matters all the more intensely personal when disease or physical disability renders normal health and vitality impossible. Accordingly, "[t]he duty of the State to preserve life must encompass a recognition of an individual's right to avoid circumstances in which the individual himself would feel that efforts to sustain life demean or degrade his humanity. [Citation.] It is antithetical to our scheme of ordered liberty and to our respect for the autonomy of the individual for the State to make decisions regarding the individual's quality of life. It is for the patient to decide such issues." (*Brophy, supra,* 497 N.E.2d at p. 635; *McKay* v. *Bergstedt, supra,* 801 P.2d at pp. 624, 627.) In this situation, "the value of life is desecrated not by a decision to refuse medical treatment but 'by the failure to allow a competent human being the right of choice.' [Citations.]" (*In the Matter of Farrell, supra,* 108 N.J. 335 [529 A.2d at p. 411], quoting *Superintendent of Belchertown State School* v. *Saikewicz* (1977) 373 Mass. 728 [370 N.E.2d 417, 426] (*Saikewicz*).)

The fact that an individual's decision to forego medical intervention may cause or hasten death does not qualify the right to make that decision in the first instance. (*Bouvia, supra,* 179 Cal.App.3d at pp. 1143, 1144; *In the Matter of Farrell, supra,* 108 N.J. 335 [529 A.2d at p. 410].) Particularly in this day of sophisticated technology, the potential medical benefit of a proposed treatment is only one of the factors a patient must evaluate in assessing his or her perception of a meaningful existence. Since death is the natural conclusion of all life, the precise moment may be less critical than the quality of time preceding it. Especially when the prognosis for full recovery from serious illness or incapacitation is dim, the relative balance of benefit and burden must lie within the patient's exclusive estimation: "That personal weighing of values is the essence of self-determination." (*In re Gardner, supra,* 534 A.2d at p. 955; *Conservatorship of Drabick* (1988) 200 Cal.App.3d 185, 208 [245 Cal.Rptr. 840]; *Barber, supra,* 147 Cal.App.3d at p. 1019; *Rasmussen* v. *Fleming, supra,* 154 Ariz. 207 [741 P.2d at p. 683].) As Justice Brennan explained in his dissenting opinion in *Cruzan, supra,* "The possibility of a medical miracle [may] indeed [be] part of the calculus, but it is a part of the *patient's* calculus." (497 U.S. at p. 321 [111 L.Ed.2d at p. 269] (dis. opn. of Brennan, J.), italics in the original.)

Thus, "[w]hile both of the[] state interests in life are certainly strong, in themselves they will usually not foreclose a competent person from declining life-sustaining medical treatment . . . . This is because the life that the state is seeking to protect in such a situation is the life of the same person who has competently decided to forego the medical intervention; it is not some other actual or potential life that cannot adequately protect itself. [Citations.]" (*In the Matter of Conroy, supra,* 98 N.J. 321 [486 A.2d at p.

1223]; see also *Bouvia, supra,* 179 Cal.App.3d at p. 1143; *Cruzan, supra,* 497 U.S. at p. 313 [111 L.Ed.2d at pp. 263-264] (dis. opn. of Brennan, J.); *In re Gardner, supra,* 534 A.2d at p. 955; *Brophy, supra,* 497 N.E.2d at p. 636; *Myers, supra,* 399 N.E.2d at p. 458; *McKay* v. *Bergstedt, supra,* 801 P.2d at pp. 622-623.)

Moreover, the state has not embraced an unqualified or undifferentiated policy of preserving life at the expense of personal autonomy. (See *Cruzan, supra,* 497 U.S. at p. 314, fn. 15 [111 L.Ed.2d at p. 265] (dis. opn. of Brennan, J.).) As a general proposition, "[t]he notion that the individual exists for the good of the state is, of course, quite antithetical to our fundamental thesis that the role of the state is to ensure a maximum of individual freedom of choice and conduct." (*In re Osborne* (D.C. 1972) 294 A.2d 372, 375, fn. 5.) In California, the Natural Death Act and other statutory provisions permitting an individual or designated surrogate to exercise conclusive control over the administration of life-sustaining treatment evidence legislative recognition that fostering self-determination in such matters enhances rather than deprecates the value of life. (Health & Saf. Code, § 7185 et seq.; Civ. Code, § 2500 et seq.; see also *McKay* v. *Bergstedt, supra,* 801 P.2d at p. 623; *In the Matter of Conroy, supra,* 98 N.J. 321 [486 A.2d at pp. 1223-1224].)

■ Examining the facts of the present case in light of the foregoing considerations, we find no countervailing state interest in the preservation of life sufficient to sustain a duty on the part of petitioner superseding the right to refuse unwanted medical treatment. Andrews suffers from a profoundly disabling and irreversible physical condition, which not only imposes total dependence on others for all bodily functions but renders him susceptible to illness and infection requiring further medical attention. (See *Bouvia, supra,* 179 Cal.App.3d at p. 1143; *Brophy, supra,* 497 N.E.2d at p. 631, fn. 21; *McKay* v. *Bergstedt, supra,* 801 P.2d at p. 624.) The treatment proposed by petitioner involves a substantial surgical procedure, with the potential not only to cause discomfort and pain but also to create additional risks. (See *In re Gardner, supra,* 534 A.2d at p. 954, fn. 7; cf. *Schmerber* v. *California, supra,* 384 U.S. 757 [routine blood test was reasonable bodily intrusion in light of state's interest to preserve evidence of criminal conduct]; *Jacobson* v. *Massachusetts* (1905) 197 U.S. 11 [49 L.Ed. 643, 25 S.Ct. 358] [simple vaccination permissible to protect public health].) While it may serve to extend Andrews's life, it offers no hope of reversing his affliction. It remains palliative at best. "[A]s the quality of life diminishes because of physical deterioration, the State's interest in preserving life may correspondingly decrease." (*McKay* v. *Bergstedt, supra,* 801 P.2d at p. 622; see also *Bouvia, supra,* 179 Cal.App.3d at pp. 1143-1144.)

Petitioner contends, however, that Andrews does not suffer the same degree of debilitation as the patients in *Bouvia* and *Bartling*, for whom chronic pain and dependence made life hopeless and "intolerable." (*Bartling, supra,* 163 Cal.App.3d at p. 193; *Bouvia, supra,* 179 Cal.App.3d at pp. 1142-1143.) According to petitioner, Andrews does not endure their "unending agony" and therefore is entitled to a proportionately smaller measure of control over bodily intrusions. This argument misapprehends the intensely individual nature and broadly based scope of the right to personal autonomy, which simply will not accommodate the kind of parsing petitioner invites.[11] For self-determination to have any meaning, it cannot be subject to the scrutiny of anyone else's conscience or sensibilities. It is the individual who must live or die with the course of treatment chosen or rejected, not the state. Particularly when the restoration of normal health and vitality is impossible, only the person whose moment-to-moment existence lies in the balance can resolve the difficult and uniquely subjective questions involved.[12] Regardless of the consequences, the courts, the medical profession, and even family and friends must accept the decision with understanding and compassion. We therefore hold that Andrews's right of self-determination and bodily integrity prevails over any countervailing duty to preserve life. (*Myers, supra,* 399 N.E.2d at p. 458.)

■ With respect to the prevention of suicide, the state has expressed a limited interest at best since it imposes no criminal or civil sanction for intentional acts of self-destruction. Moreover, "[n]o state interest is compromised by allowing [an individual] to experience a dignified death rather than an excruciatingly painful life." (*Donaldson* v. *Lungren, supra,* 2 Cal.App.4th at p. 1622.)

Judicial authority also uniformly rejects the contention that acquiescence in the decision to forego a life-sustaining procedure subjects the physician to liability for aiding and abetting suicide and therefore permits countermanding a patient's control over the course of treatment. In the first place, "[t]his state interest in protecting people from direct and purposeful self-destruction is motivated by, if not encompassed within, the state's more basic interest in preserving life. Thus, it is questionable whether it is a distinct state interest

---

[11]For example, a person suffering from cancer may be experiencing no pain or other symptoms at the time he or she decides to forego surgery, chemotherapy, or similar medical intervention that might effect a cure or at least prolong life. Nevertheless, that individual retains the right to decline such treatment irrespective of the present quality of life.

[12]Clearly, many individuals with profound disabilities courageously confront and overcome daunting physical challenges to lead productive and satisfying lives, reflecting the vast potential and determination of the human spirit. (See, e.g., *In re Marriage of Carney* (1979) 24 Cal.3d 725, 734-740 [157 Cal.Rptr. 383, 598 P.2d 36, 3 A.L.R.4th 1028].) Nevertheless, this fact does not dictate a similar choice for others.

worthy of independent consideration." (*In the Matter of Conroy, supra,* 98 N.J. 321 [486 A.2d at p. 1224]; cf. *In re Caulk* (1984) 125 N.H. 226 [480 A.2d 93, 96-97] [medical intervention permitted when otherwise healthy prisoner expressed preference for death to life in prison and refused to eat].)

Second, a necessary distinction exists between a person suffering from a serious life-threatening disease or debilitating injury who rejects medical intervention that only prolongs but never cures the affliction and an individual who deliberately sets in motion a course of events aimed at his or her own demise and attempts to enlist the assistance of others.[13] In this respect, we agree with the Supreme Court of Nevada: "If a competent adult is beset with an irreversible condition such as quadriplegia, where life must be sustained artificially and under circumstances of total dependence, the adult's attitude or motive may be presumed not to be suicidal." (*McKay* v. *Bergstedt, supra,* 801 P.2d at p. 627.) Accordingly, petitioner would not be aiding and abetting a suicide (see Pen. Code, § 401) and has no duty to intervene on this basis.

The state's concern for maintaining the ethical integrity of the medical profession also warrants due consideration. However, we perceive no threat to this interest in upholding the individual's right to self-determination in medical decisionmaking, including the right to decline life-sustaining treatment. (See *Bouvia, supra,* 179 Cal.App.3d at pp. 1140-1141; *Brophy, supra,* 497 N.E.2d at p. 638; *Myers, supra,* 399 N.E.2d at p. 458.) To begin with, notwithstanding rigorous standards respecting the duty to preserve life, "[p]revailing medical ethical practice does not, without exception, demand that all efforts toward life prolongation be made in all circumstances." (*Satz* v. *Perlmutter, supra,* 362 So.2d at p. 163.)

Moreover, these standards cannot exist in a social and moral vacuum, thereby encouraging a form of medical paternalism under which the physician's determination of what is "best," i.e., medically desirable, controls over patient autonomy. Doctors have the responsibility to advise patients fully of those matters relevant and necessary to making a voluntary and intelligent choice. Once that obligation is fulfilled, "[i]f the patient rejected the doctor's advice, the onus of that decision would rest on the patient, not

---

[13]*Bouvia, supra,* 179 Cal.App.3d at page 1145; *Rasmussen* v. *Fleming, supra,* 154 Ariz. 207 [741 P.2d at page 685]; *Brophy, supra,* 497 N.E.2d at page 638; *McKay* v. *Bergstedt, supra,* 801 P.2d at pages 626-627; *In the Matter of Farrell, supra,* 108 N.J. 335 [529 A.2d at page 411]; see *Donaldson* v. *Lungren, supra,* 2 Cal.App.4th at pages 1621-1624; see generally Byrn, *Compulsory Lifesaving Treatment for the Competent Adult* (1975) 44 Fordham L.Rev. 1, 19-24; compare Health and Safety Code section 7191.5, subdivision (a) (death resulting from withholding or withdrawal of life-sustaining treatment pursuant to Natural Death Act does not constitute suicide).

the doctor. Indeed, if the patient's right to informed consent is to have any meaning at all, it must be accorded respect even when it conflicts with the advice of the doctor or the values of the medical profession as a whole." (*In the Matter of Conroy, supra,* 98 N.J. 321 [486 A.2d at p. 1225]; *Bartling, supra,* 163 Cal.App.3d at p. 195; *Saikewicz, supra,* 370 N.E.2d at p. 427.)

Amicus curiae California Medical Association, representing over 30,000 physicians statewide, fully supports the "primacy of patient autonomy" and urges this court "to affirm that a mentally competent [person] has a virtually unqualified right to refuse unwanted medical treatment." While the facts of this case necessarily circumscribe our holding short of such a sweeping declaration, this advocacy underscores the growing perception both in the medical and legal professions and in society at large that these principles do not compromise the ethical standards of physicians. (See, e.g., Health & Saf. Code, §§ 7190, 7191 [physician unwilling to comply with declaration under Natural Death Act must transfer patient or be subject to misdemeanor charges].)

Our conclusion that the patient's choice must be respected regardless of the doctor's judgment does not denigrate professional standards of care. Rather, it attests to their continuing and critical importance in maximizing the broader precept of self-determination that transcends a particular course of treatment. Patient autonomy and medical ethics are not reciprocals; one does not come at the expense of the other. The latter is a necessary component and complement of the former and should serve to enhance rather than constrict the individual's ability to resolve a medical decision in his or her best *overall* interests.

■ Petitioner also raises concerns for potential criminal and civil liability. While such apprehensions are not always unfounded, they are unsubstantiated under these circumstances. When a competent, informed adult directs the withholding or withdrawal of medical treatment, even at the risk of hastening or causing death, medical professionals who respect that determination will not incur criminal or civil liability; the patient's decision discharges the physician's duty. (*Bouvia, supra,* 179 Cal.App.3d at p. 1145; *Bartling, supra,* 163 Cal.App.3d at p. 197; *Barber, supra,* 147 Cal.App.3d at pp. 1017-1018; see *Kirby* v. *Spivey* (1983) 167 Ga.App. 751 [307 S.E.2d 538, 540]; *In re Gardner, supra,* 534 A.2d at p. 956; *Saikewicz, supra,* 370 N.E.2d at p. 427, fn. 12; *In the Matter of Farrell, supra,* 108 N.J. 335 [529 A.2d at pp. 415-416]; see also Civ. Code, § 2512 [no liability for acting in good faith reliance on durable power of attorney for health care decisions]; Health & Saf. Code, § 7190.5 [no civil or criminal liability for giving effect to declaration under Natural Death Act]; cf. *Donaldson* v. *Lungren, supra,* 2 Cal.App.4th at pp. 1624-1625 [criminal liability for assisting suicide].)

The final consideration is the protection of innocent third parties. Contrary to petitioner's allegations, neither he nor any other prison personnel come within the class of persons encompassed by this state interest. Generally, this concern arises when the refusal of medical treatment endangers public health or implicates the emotional or financial welfare of the patient's minor children. (Byrn, *Compulsory Lifesaving Treatment for the Competent Adult, supra,* 44 Fordham L.Rev. at pp. 33-34; *In re Gardner, supra,* 534 A.2d at p. 953, fn. 5; see, e.g., *Application of President & Directors of Georgetown Col.* (D.C.Cir. 1964) 331 F.2d 1000, 1008, opn. filed on den. rehg., 331 F.2d 1010; but see *In re Osborne, supra,* 294 A.2d at p. 375 [declining to order blood transfusion for father with two young children in light of family support].) This case involves neither circumstance.

In summary, we conclude that a competent, informed adult, in the exercise of self-determination and control of bodily integrity, has the right to direct the withholding or withdrawal of life-sustaining medical treatment, even at the risk of death, which ordinarily outweighs any countervailing state interest. The right does not depend upon the nature of the treatment refused or withdrawn; nor is it reserved to those suffering from terminal conditions. Once a patient has declined further medical intervention, the physician's duty to provide such care ceases.

III.

A.

The question remains as to the extent to which Andrews, as a state prison inmate, may exercise this right. By its nature, incarceration inevitably restricts an individual's freedom. Beyond the obvious fact of confinement, the need to ensure institutional security may place substantial limitations on a prisoner's ability to exercise rights of association, expression, and privacy, among others. (See, e.g., *In re Cummings* (1982) 30 Cal.3d 870 [180 Cal.Rptr. 826, 640 P.2d 1101, 29 A.L.R.4th 1207]; *In re Alcala* (1990) 222 Cal.App.3d 345 [271 Cal Rptr. 674]; *In re Gallego* (1982) 133 Cal.App.3d 75 [183 Cal.Rptr. 715].) For example, in *In re Alcala,* the Court of Appeal upheld the authority of prison administrators to prohibit the possession of certain items of personal clothing despite the infringement on various constitutional and statutory interests because of a demonstrated threat to custodial control. (222 Cal.App.3d at pp. 372-377.)

Prison administrative authority is not unqualified, however. As we have already alluded, Penal Code section 2600 expressly provides that a prisoner

"may . . . be deprived of such rights, and only such rights, as is necessary in order to provide for the reasonable security of the institution in which he is confined and for the reasonable protection of the public." (See also *Bell* v. *Wolfish* (1979) 441 U.S. 520, 545-547 [60 L.Ed.2d 447, 472-474, 99 S.Ct. 1861].) Under California law persons sentenced to prison no longer suffer "civil death" (Stats. 1850, ch. 99, § 145, p. 247; see *Hayashi* v. *Lorenz* (1954) 42 Cal.2d 848, 852 [271 P.2d 18]) but "retain the rights of free persons," unless safety or security may be compromised. (*De Lancie* v. *Superior Court* (1982) 31 Cal.3d 865, 868 [183 Cal.Rptr. 866, 647 P.2d 142]; see, e.g., *In re Reynolds* (1979) 25 Cal.3d 131 [157 Cal.Rptr. 892, 599 P.2d 86] [prisoners permitted to wear union lapel button absent evidence of disruption]; *Keyhea* v. *Rushen* (1986) 178 Cal.App.3d 526 [223 Cal.Rptr. 746] [affording prisoner competency hearing prior to involuntary psychotropic medication did not threaten prison security].)

In refusing to consent to further treatment, Andrews is exercising his fundamental right of self-determination in medical decisions. Petitioner has offered no evidence that allowing him to do so undermines prison integrity or endangers the public.[14] Thus, considering the magnitude of the right at issue in light of the clear legislative directive articulated in Penal Code section 2600, we hold that petitioner must accede to Andrews's decision and may not force him to accept unwanted treatment or care. (See *Keyhea* v. *Rushen, supra,* 178 Cal.App.3d 526; *Runnels* v. *Rosendale* (9th Cir. 1974) 499 F.2d 733, 735; *Zant* v. *Prevatte* (1982) 248 Ga. 832 [286 S.E.2d 715]; cf. *Coffin* v. *Reichard* (6th Cir. 1944) 143 F.2d 443, 445 [155 A.L.R. 143] [prisoner has "right to personal security against unlawful invasion"]; but see *Washington* v. *Harper* (1990) 494 U.S. 210 [108 L.Ed.2d 178, 110 S.Ct. 1028] [officials may administer unwanted psychotropic drugs when inmate's mental disability poses threat to himself or prison safety].)

We are not unmindful of the difficulties involved in maintaining an orderly and secure penal institution; and our holding does not imply any attenuation of the deference accorded the experience and expertise of administrative officials in such matters. (*Bailey* v. *Loggins* (1982) 32 Cal.3d 907, 922 [187 Cal.Rptr. 575, 654 P.2d 758]; *In re Alcala, supra,* 222 Cal.App.3d at pp. 372-373; see also *Jones* v. *North Carolina Prisoners' Union* (1977) 433 U.S. 119, 126 [53 L.Ed.2d 629, 638-639, 97 S.Ct. 2532].) In another case, or in this case if a change of circumstances warrant, we do not preclude

---

[14]In the Court of Appeal, petitioner asserted that Andrews's actions hypothetically threaten security, but he failed to substantiate those speculations. On review, petitioner abandons the argument altogether. Consequently, we do not address the question of whether a member of the prison medical staff has standing to raise concerns for institutional security or whether such matters lie within the exclusive province of administrative authorities.

prison authorities from establishing the need to override an inmate's choice to decline medical intervention. (*Bailey* v. *Loggins, supra,* 32 Cal.3d at p. 922.) A custodial environment is uniquely susceptible to the catalytic effect of disruptive conduct; and courts will not interfere with reasonable measures required to forestall such untoward consequences. (See, e.g., *Myers, supra,* 399 N.E.2d at pp. 457-458; cf. *In re Caulk, supra,* 480 A.2d at pp. 95-96 [authorities could intervene with medical treatment when otherwise healthy prisoner's attempt to starve himself threatened prison discipline and security]; *Von Holden* v. *Chapman* (1982) 87 A.D.2d 66 [450 N.Y.S.2d 623, 625] [same].) However, such measures must be demonstrably "reasonable" and "necessary," not a matter of conjecture.

## B.

 Apart from institutional concerns, petitioner also asserts a duty to override Andrews's lack of consent based on the decision of *Estelle* v. *Gamble, supra,* 429 U.S. 97, in which the United States Supreme Court concluded "that deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' [citation] proscribed by the Eighth Amendment." (*Id.,* at p. 104 [50 L.Ed.2d at p. 260]; cf. Cal. Code Regs., tit. 15, § 3351 [under California Department of Corrections rule, physician may administer unconsented medical treatment in emergency "to save the life or avoid serious physical damage to an inmate."];[15] *DeShaney* v. *Winnebago Cty. Soc. Serv. Dept.* (1989) 489 U.S. 189 [103 L.Ed.2d 249, 109 S.Ct. 998] [state has affirmative responsibility for general well-being of persons taken into custody and held].) Petitioner misconceives the import of this holding. The constitutional obligation of medical personnel to provide treatment has no independent origin; it necessarily derives from and complements the prisoner's right to receive needed medical attention. Waiver of treatment discharges the duty to treat and negates the possibility of "deliberate indifference." (See *McCracken* v. *Jones* (10th Cir. 1977) 562 F.2d 22, 25.) The principle articulated in *Estelle* v. *Gamble, supra,* 429 U.S. 97, does not render inmates captives of unwanted ministrations; we decline to transmute the prisoner's shield into the physician's sword.

---

[15]California Code of Regulations, title 15, section 3351, provides, "Medical treatment, including medication, will not be forced over the objections of a mentally competent inmate . . . except when immediate action is necessary to save the life or avoid serious physical damage to an inmate." Petitioner contends that because Andrews may die or substantially suffer without forced feeding, this regulation authorizes nonconsensual treatment. We do not construe section 3351 so broadly as to sanction infringement of the right to self-determination in medical decisions under these circumstances. Rather, the exception appears to be simply a statement of "the general rule that in cases of emergency, or unanticipated conditions where immediate action is found necessary for the preservation of the life or health of a patient and it is impracticable to first obtain consent to the operation or treatment," consent will be presumed and the physician may proceed. (*Preston* v. *Hubbell* (1948) 87 Cal.App.2d 53, 57-58 [196 P.2d 113].)

By the same token, we will not sanction or condone manipulation of a prisoner's medical circumstances to the prejudice of either institutional safety and security or the constitutional and regulatory obligations of prison authorities. (See *Myers, supra,* 399 N.E.2d at p. 458; cf. *In re Caulk, supra,* 480 A.2d at p. 96; *State ex rel. White* v. *Narick* (W.Va. 1982) 292 S.E.2d 54, 58.) Officials are not precluded from considering purpose or motive in determining whether the exercise of rights "is likely to be . . . disruptive . . . , or otherwise detrimental to the effective administration of the [state] prison system." (*Jones* v. *North Carolina Prisoners' Union, supra,* 433 U.S. at p. 126, fn. 4 [53 L.Ed.2d at p. 639]; cf. *Bouvia, supra,* 179 Cal.App.3d at p. 1145 [patient's "motive" in refusing treatment not subject to approval].) Thus, for example, an inmate may not seek to gain an advantage in placement within the prison system by rejecting necessary medical treatment. (*Myers, supra,* 399 N.E.2d 452.)[16]

Amicus curiae raises a collateral concern unique to the prison context: The possible inadequacy of medical and related support services for ill or injured inmate patients may compromise the voluntariness of their decision to forego life-sustaining treatment. For example, in the case of a seriously disabled prisoner, the lack of rehabilitative personnel or facilities, psychological counseling, or necessary physical accommodations of the disability may unduly influence the individual's choice to reject further medical intervention even of a palliative nature. Given the potential vulnerability of such patients, amicus curiae proposes some form of mandatory judicial intercession, which would include the appointment of "an independent expert to assess the adequacy of the prisoner's environment on the prisoner's capacity to make a 'rational' choice."

Although we appreciate the significance of these considerations, we are reluctant for several reasons to formulate any particular procedure for determining a competent prisoner's right to control decisionmaking with respect to his or her own health care. First, as a general proposition, judicial intervention of the type proposed tends to denigrate the principle of personal autonomy, substituting a species of legal paternalism for the medical paternalism the concept of informed consent seeks to eschew. "Rationality" is for the patient to determine. Judicial scrutiny therefore should be considered as a course of last resort. (See *Barber, supra,* 147 Cal.App.3d at pp. 1021-1022;

---

[16]Under the facts of this case, we have no occasion to address, and therefore do not decide, any related issues that might arise in the event an otherwise healthy inmate with no underlying affliction engages in a course of conduct for nonmedical reasons, such as a hunger strike, that subsequently necessitates therapeutic intervention to prevent death. (See, e.g., *In re Caulk, supra,* 480 A.2d 93; *Zant* v. *Prevatte, supra,* 286 S.E.2d 715; *Von Holden* v. *Chapman, supra,* 87 A.D.2d 66 [450 N.Y.S.2d 623]; *State ex rel. White* v. *Narick, supra,* 292 S.E.2d 54.)

*In the Matter of Farrell, supra,* 108 N.J. 335 [529 A.2d at p. 415].) Second, on the record before us, we have no reason to believe that the factors identified by amicus curiae have influenced Andrews's refusal of further medical intervention. Nor does the record at this point raise unanswered questions implying a possible lack of voluntariness.[17]

Third, any individual who suffers a debilitating or life-threatening disease or injury inevitably faces choices in medical decisionmaking affected or even dictated by his or her life circumstances, including resultant depression, limited financial resources, and minimal family or social support systems. (See, e.g., *McKay* v. *Bergstedt, supra,* 801 P.2d 617.) Although in some respects unique, the prison environment is simply one such circumstance in the individual's personal calculus; and we have no basis for assuming it inherently jeopardizes the voluntariness of that process for inmates.

Finally, while we presume medical facilities within prison walls meet the same professional standards as those without (see Pen. Code, §§ 5068, 5079; cf. Evid. Code, § 664), we recognize amicus curiae has expressed a legitimate concern for their adequacy to handle the special needs of certain inmate patients. However, absent evidence of a specific deficiency, we conclude that constitutional and administrative protections guaranteeing an inmate proper treatment commensurate with his or her medical condition suffice to address this contingency. (*Estelle* v. *Gamble, supra,* 429 U.S. at pp. 104-106 [50 L.Ed.2d at pp. 260-261]; Cal. Code Regs., tit. 15, §§ 3350 et seq. [standards for prison medical services], 3360 et seq. [standards for prison mental health services].) State regulations governing the Department of Corrections provide for administrative proceedings in the event a prisoner challenges the adequacy of medical care. (See Cal. Code Regs., tit. 15, § 3084.1, subd. (a) [inmate may appeal to departmental review board any condition perceived as adversely affecting welfare].) Once administrative remedies are exhausted, the inmate patient may seek habeas corpus relief. (See, e.g., *In re Coca* (1978) 85 Cal.App.3d 493, 501-503 [149 Cal.Rptr. 465]; *In re Ingram* (1978) 76 Cal.App.3d 495, 501, fn. 2 [142 Cal.Rptr. 825]; *In re Berry* (1952) 113 Cal.App.2d 613, 614 [248 P.2d 420].) Prisoners also have recourse to federal court to rectify deficiencies in their medical care. (42 U.S.C. § 1983; see *Estelle* v. *Gamble, supra,* 429 U.S. at p. 101 [50 L.Ed.2d at p. 258]; *Runnels* v. *Rosendale, supra,* 499 F.2d 733.) Accordingly, we perceive no need at this time to mandate a different or separate judicial procedure for situations involving the refusal of treatment, assuming the question does not involve the inmate's competence.

---

[17]Although proceedings in the superior court were ex parte and resolved before Andrews had any opportunity to respond, he has been ably represented by counsel since petitioner sought writ review in the Court of Appeal. From the record, counsel appears knowledgeable about state prison medical facilities in general as well as the particulars of this case.

Howard Andrews has refused to consent to the administration of nutrition or medication to him by means of a feeding tube. The parties agree Andrews is competent to make this decision and is aware of its consequences. The record substantiates no countervailing state interest sufficient to override the exercise of his right to self-determination in this respect. Accordingly, we find no duty on the part of petitioner as his physician to provide further life-sustaining procedures and therefore decline to authorize him to take any action inconsistent with or contrary to Andrews's express choice regarding the course of his medical treatment.

## IV.

We confront here the development and evolution of medical-legal relationships, which call for the setting of bounds reflecting the wisdom and spirit of our times. The balance of rights and responsibilities must not endanger the dignity of the law or of human beings. In considering the lessons of history and progress, our duty is inevitable, and in accord with the enlightenment of modern circumstances.

## V.

The alternative writ issued June 8, 1992, is discharged; and the stay order issued May 1, 1992, is vacated. The petition for writ of mandate is denied.

Lucas, C. J., Mosk, J., Panelli, J., Kennard, J., Baxter, J., and George, J., concurred.