[No. C021772. Third Dist. Nov. 21, 1997]

WILLIAM FLUHARTY, Plaintiff and Appellant, v.
JACK FLUHARTY, Defendant and Respondent.

**Counsel**

John C. Schaller for Plaintiff and Appellant.

Moss & Enochian, Larry B. Moss and Mark D. Norcross for Defendant and Respondent.

**Opinion**

**PUGLIA, P. J.**—"The life of the law has not been logic: it has been experience." (Holmes, The Common Law (1881) p. 1.) There are occasions in the course of judicial decisionmaking when it becomes necessary to stand athwart the relentless march of logic and shout, "Enough already!!" The decision in this case, in which plaintiff seeks to recover from his father for emotional distress allegedly occasioned by his father's attempted suicide, is one of those occasions.

Plaintiff initiated this action against his father (defendant), to recover for emotional distress negligently inflicted by defendant who, immediately after he had murdered his wife (plaintiff's mother), notified plaintiff of what he had done, advised plaintiff that he intended to take his own life and, when plaintiff appeared on the scene, attempted suicide in the presence of plaintiff, who successfully intervened. Following a number of pretrial rulings narrowing plaintiff's claims, the court conducted a bench trial and entered judgment for defendant. Plaintiff appeals. We shall affirm.

I

On the evening of July 14, 1992, defendant killed his wife. He then telephoned plaintiff and declared: " 'I just blew your mother's head off and I am going to blow my head off.' " Plaintiff and his wife immediately drove the short distance to defendant's home and found defendant in the driveway

"with a shotgun pointed [at] his chin, and the butt on the ground with [a] stick in the trigger mechanism area." Plaintiff observed his mother in a parked car "slumped over from the driver's side to the passenger's side, with no face." Plaintiff asked defendant if he was going to kill himself in front of his son and daughter-in-law and defendant responded: " 'You're God damn right I am. I'm not going to jail.' " Plaintiff pleaded with defendant not to shoot himself. He kept talking to defendant and edged closer. When defendant was distracted, plaintiff "lunged for the gun." They wrestled for control of the weapon and it discharged, very slightly injuring plaintiff's wife. Defendant was subdued and taken into custody. He was later convicted of murdering his wife and sentenced to prison. As a result of the July 14 incident, plaintiff alleged he developed posttraumatic stress disorder.

Plaintiff and his siblings settled a wrongful death claim against defendant for the death of their mother. Thereafter, plaintiff and his wife initiated this action. Defendant moved to strike all claims relating to plaintiff's observation of his mother's corpse and defendant's attempted suicide, contending such matters are not properly cognizable on a claim for negligent infliction of emotional distress. The court granted the motion. Plaintiff and his wife thereafter filed an amended complaint based essentially on the same factual allegations but seeking recovery on the basis of their status as rescuers. Defendant again moved to strike on the same basis as before, and the court granted the motion.

In his second amended complaint, plaintiff sought to recover for assault and battery and negligent infliction of emotional distress on the theory he was both a "bystander" and a "direct victim."[1] It was alleged the emotional distress was occasioned by the injury to plaintiff's wife and the struggle over the shotgun.

Given its pretrial rulings, the court at trial refused to consider matters relating to the death of plaintiff's mother or defendant's attempted suicide. The court rejected the remaining claims as not supported by the evidence. The court specifically concluded there had been no assault or battery and, while plaintiff is in the class of persons to whom defendant owes a duty not to inflict emotional distress, defendant's conduct was not sufficiently "outrageous" to be actionable.

On appeal plaintiff attacks the rejection of his claims both at trial and in pretrial rulings.

---

[1] The complaint also contains claims for recovery under a "rescue theory" and for wrongful death. Plaintiff has abandoned these theories on appeal.

## II

Before addressing plaintiff's contentions, we point out what this case is not about. This is not a wrongful death action regarding the murder of plaintiff's mother. That claim was settled by plaintiff and his siblings. There is also no claim by plaintiff's wife either for physical injury or emotional distress. Her claims were resolved prior to judgment and she has not appealed. Finally, the trial court found plaintiff suffered no physical injury, and this finding is not challenged on appeal.

Theories of recovery for emotional distress lead into an analytic quagmire. The California Supreme Court has undertaken to clarify this area of the law:

■ "The law of negligent infliction of emotional distress in California is typically analyzed . . . by reference to two 'theories' of recovery: the 'bystander' theory and the 'direct victim' theory. . . . [¶] . . . [¶] We have repeatedly recognized that '[t]he *negligent* causing of emotional distress is not an independent tort, but the tort of *negligence*. . . . The traditional elements of duty, breach of duty, causation, and damages apply. [¶] Whether a defendant owes a duty of care is a question of law. Its existence depends upon the foreseeability of the risk and a weighing of policy considerations for and against imposition of liability. . . .' . . .

"The distinction between the 'bystander' and 'direct victim' cases is found in the source of the duty owed by the defendant to the plaintiff. ■ The 'bystander' cases, commencing with *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912], and culminating in *Thing* [v. *La Chusa*] 48 Cal.3d 644 [257 Cal.Rptr. 865, 771 P.2d 814], address 'the question of duty in circumstances in which a plaintiff seeks to recover damages as a percipient witness to the injury of another.' . . . These cases 'all arise in the context of physical injury or emotional distress caused by the negligent conduct of a defendant *with whom the plaintiff had no preexisting relationship, and to whom the defendant had not previously assumed a duty of care beyond that owed to the public in general.*' . . . In other words, bystander liability is premised upon a defendant's violation of a duty not to negligently cause emotional distress to people who observe conduct which causes harm to another.

"Because in such cases the class of potential plaintiffs could be limitless, resulting in the imposition of liability out of all proportion to the culpability of the defendant, this court has circumscribed the class of bystanders to whom a defendant owes a duty to avoid negligently inflicting emotional

distress. These limits are set forth in *Thing* as follows: 'In the absence of physical injury or impact to the plaintiff himself, damages for emotional distress should be recoverable only if the plaintiff: (1) is closely related to the injury victim, (2) is present at the scene of the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim and (3) as a result suffers emotional distress beyond that which would be anticipated in a disinterested witness.' . . .

■ "In contrast, the label 'direct victim' arose to distinguish cases in which damages for serious emotional distress are sought as a result of a breach of duty owed the plaintiff that is 'assumed by the defendant or imposed on the defendant as a matter of law, or that arises out of a relationship between the two.' . . . In these cases, the limits set forth in *Thing, supra,* 48 Cal.3d 644, have no direct application. . . . Rather, well-settled principles of negligence are invoked to determine whether all elements of a cause of action, including duty, are present in a given case.

"Much of the confusion in applying rules for bystander and direct victim recovery to the facts of specific cases can be traced to this court's decision in *Molien* [v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518]], which first used the 'direct victim' label. In that case, we answered in the affirmative the question of whether, in the context of a negligence action, damages may be recovered for serious emotional distress unaccompanied by physical injury. . . .

"In so holding, we found that a hospital and a doctor owed a duty directly to the husband of a patient, who had been diagnosed incorrectly by the doctor as having syphilis and had been told to so advise her husband in order that he could receive testing and, if necessary, treatment. . . . We reasoned that the risk of harm to the husband was reasonably foreseeable and that the 'alleged tortious conduct of the defendant was directed to him as well as to his wife.' . . . Under such circumstances we deemed the husband to be a 'direct victim' and found the criteria for bystander recovery not to be controlling. . . .

"The broad language of the *Molien* decision, coupled with its perceived failure to establish criteria for characterizing a plaintiff as a 'direct victim' rather than a 'bystander,' has subjected *Molien* to criticism from various sources, including this court. . . . The great weight of this criticism has centered upon the perception that *Molien* introduced a new method for determining the existence of a duty, limited only by the concept of foreseeability. To the extent that *Molien, supra,* 27 Cal.3d 916, stands for this proposition, it should not be relied upon and its discussion of duty is limited

to its facts. As recognized in *Thing*, '[I]t is clear that foreseeability of the injury alone is not a useful "guideline" or a meaningful restriction on the scope of [an action for damages for negligently inflicted emotional distress.]' . . .

"Nevertheless, other principles derived from *Molien, supra,* 27 Cal.3d 916, are sound: (1) damages for negligently inflicted emotional distress may be recovered in the absence of physical injury or impact, and (2) a cause of action to recover damages for negligently inflicted emotional distress will lie, notwithstanding the criteria imposed upon recovery by bystanders, in cases where a duty arising from a preexisting relationship is negligently breached. . . . In fact, it is this later principle which defines the phrase 'direct victim.' That label signifies nothing more." (*Burgess* v. *Superior Court* (1992) 2 Cal.4th 1064, 1071-1074 [9 Cal.Rptr.2d 615, 831 P.2d 1197], citations and fns. omitted, original italics.)

Despite the Supreme Court's attempt in *Burgess* to clarify this area of the law, the waters were muddied two years later in *Bro* v. *Glaser* (1994) 22 Cal.App.4th 1398 [27 Cal.Rptr.2d 894]. *Bro* was a direct victim case in which an obstetrician nicked a baby's cheek during delivery and the parents sued for infliction of emotional distress from seeing their newborn in a bandage. The Court of Appeal attempted to synthesize prior cases and come up with a black letter rule workable in all situations. The court decreed: "[A] person in an existing, consensual relationship with another has a legally protected interest in being free of emotional distress unintentionally caused by the *outrageous* conduct of that other." (22 Cal.App.4th at p. 1441, italics added.)

We rejected *Bro*'s black letter approach in *Mercado* v. *Leong* (1996) 43 Cal.App.4th 317 [50 Cal.Rptr.2d 569], in which an obstetrician left a high-risk patient during labor to perform elective surgery on another and the delivery had to be performed by a family practitioner, who used a procedure which, under the circumstances, was contraindicated. The child suffered permanent injury to his arm. The trial court entered judgment for the defendant obstetrician based on a jury finding of no "outrageous" conduct. We reversed, explaining: "The *Bro* test strays from the guidelines established by the Supreme Court and places too great a reliance on one particular element of the general negligence principles which govern imposition of liability. Moreover, *Bro* injects language from the separate tort of intentional infliction of emotional distress into the negligence framework, effectively creating a hybrid cause of action. Such a creation is unwarranted, given the Supreme Court's clear pronouncement that severe emotional distress resulting from negligent conduct does not constitute a separate tort. The results in

both pre- and post-*Burgess* cases can be explained by applying the concept of foreseeability along with the other policy considerations relevant to the particular facts." (*Mercado* v. *Leong, supra*, 43 Cal.App.4th at p. 327.)

To summarize, a party may recover for negligent infliction of emotional distress as a *bystander* if he: (1) is closely related to the injury victim, (2) is present at the scene of the injury-producing event and is aware it is causing injury to the victim, and (3) suffers emotional distress beyond that anticipated in a disinterested witness. (*Thing* v. *La Chusa* (1989) 48 Cal.3d 664, 667-668 [257 Cal.Rptr. 865, 771 P.2d 814].) As a *direct victim*, a party may recover strictly emotional distress damages, i.e., absent physical injury or impact, where a duty arising from a preexisting relationship is negligently breached. (*Burgess* v. *Superior Court, supra*, 2 Cal.4th at p. 1074.) Under such circumstances, the defendant's conduct need not be "outrageous," only negligent. (*Mercado* v. *Leong, supra*, 43 Cal.App.4th at p. 327.) With this background, we turn to plaintiff's contentions on appeal.

### III

■ Plaintiff contends the trial court erred in rejecting his claim for negligent infliction of emotional distress as a *bystander* based on the shotgun blast that injured his wife. Plaintiff testified he immediately became aware the blast hit the truck behind which his wife was standing. Plaintiff further testified that after defendant was subdued he looked to see if his wife was "okay" and could not find her. Plaintiff "kind of flipped out for a few minutes," running around asking if anyone had seen her. Plaintiff was told she had been seen walking to a neighbor's house and when he looked in that direction he saw her returning.

Plaintiff contends the evidence established (1) he was closely related to the victim, (2) he was nearby when she was injured, immediately became frightened for her safety, and learned soon thereafter that she had been injured, and (3) suffered emotional distress as a result.

■ Plaintiff's contention is essentially a challenge to the sufficiency of the evidence. Our review is thus limited to a determination of whether the record contains evidence of "ponderable legal significance" which, when coupled with all reasonable inferences therefrom, supports the judgment of the trial court. (*Beck Development Co.* v. *Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1203-1204 [52 Cal.Rptr.2d 518].)

■ The critical fact precluding plaintiff's bystander claim is that, while he may have feared for his wife's safety, plaintiff was unaware of her injury

at or about the time it occurred. Plaintiff testified the first time he learned his wife had been injured was two hours after the incident. Hence, substantial evidence supports the conclusion of the trial court.

## IV

We come now to the crux of this matter. Plaintiff contends the trial court erred in concluding he cannot recover as a *direct victim* for negligent infliction of emotional distress. Plaintiff argues defendant's conduct, including killing plaintiff's mother, inviting plaintiff to view the scene, attempting to kill himself in plaintiff's presence, struggling over the shotgun, and discharging it, was sufficiently outrageous to support such a claim. He further argues that because there was physical impact during the struggle over the shotgun, the conduct need not have been outrageous.

As previously explained, plaintiff's recovery for negligent infliction of emotional distress as a direct victim does not turn on whether defendant's conduct was outrageous or whether there was physical impact or injury. The determinative issue is whether defendant owed plaintiff a duty of care under the circumstances presented.

"The threshold element of a cause of action for negligence is the existence of a duty to use due care toward an interest of another that enjoys legal protection against unintentional invasion. . . . Whether this essential prerequisite to a negligence cause of action has been satisfied in a particular case is a question of law to be resolved by the court. . . . [¶] A judicial conclusion that a duty is present or absent is merely ' "a shorthand statement . . . rather than an aid to analysis . . . . 'Duty,' is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." ' " (*Bily* v. *Arthur Young & Co.* (1992) 3 Cal.4th 370, 397 [11 Cal.Rptr.2d 51, 834 P.2d 745, 48 A.L.R.5th 835], citations omitted.)

In the absence of a contractual obligation, the determination whether in a specific case a defendant will be held liable to a third person "is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm." (*Biakanja* v. *Irving* (1958) 49 Cal.2d 647, 650-651 [320 P.2d 16, 65 A.L.R.2d 1358]; *Bily* v. *Arthur Young & Co., supra*, 3 Cal.4th at p. 397.)

Although the infliction of emotional distress may have been foreseeable under the bizarre circumstances of this matter, this is of little assistance to plaintiff. (See *Krupnick* v. *Hartford Accident & Indemnity Co.* (1994) 28 Cal.App.4th 185, 201 [34 Cal.Rptr.2d 39]; *Huggins* v. *Longs Drug Stores California, Inc.* (1993) 6 Cal.4th 124, 133 [24 Cal.Rptr.2d 587, 862 P.2d 148]; *Thing* v. *La Chusa, supra,* 48 Cal.3d 644, 663.) As explained in *Thing* v. *La Chusa, supra,* 48 Cal.3d at page 663: "[F]oreseeability of the injury alone is not a useful 'guideline' or a meaningful restriction on the scope of the [negligent infliction of emotional distress] action. The *Dillon* experience confirms, as one commentator observed, that '[f]oreseeability proves too much. . . . Although it may set tolerable limits for most types of physical harm, it provides virtually no limit on liability for nonphysical harm.' [Citation.]"

The other relevant policy factors do not support imposition of a duty in this instance. For example, where only emotional distress is claimed, the degree of certainty that plaintiff suffered injury is diminished.

With regard to the connection between defendant's conduct and the injury claimed, this is necessarily suspect in a family setting. Heartache and emotional pain are an inherent staple of the parent-child relationship. Neither parent nor child will always live up to the other's expectations. A parent may be distressed, for example, when his child fails in school or gets in trouble with the law. A child may be distressed when his parent is fired from a job or so mismanages the family's finances that they are evicted for failure to pay rent.

These are examples of conduct which, though essentially self-destructive, cause emotional distress to members of the transgressor's family. The experience of emotional trauma is certainly not the only defining characteristic of a family relationship, but it is one of them. Indeed, it is often the price to be paid for being a member of a close family unit. Only in families that are not close are the members sufficiently indifferent to one another's personal failings not to feel emotional distress. To inject the cold, impersonal logic of the law into such an arena could lead to the destruction of close family relationships.

Furthermore, one may not necessarily assume the closeness of family ties solely from the existence of a parent-child relationship. This is necessarily a question of fact. Closeness may be attenuated where, as here, the child is an adult and neither the parent nor the child is dependent on the other for subsistence. One might also expect closeness to be diminished where, as here, the child was subjected to physical and emotional abuse at the hands of

the parent. In fact, plaintiff testified in deposition he went to defendant's home after the phone call out of "curiosity," rather than to save his father's life.

The law imposes on a parent a duty to support and care for his child only until the child completes high school or reaches the age of 19 (Fam. Code, § 3901) or while the child is incapacitated (Fam. Code, § 3910). The law also recognizes a duty of an adult child to support his needy parents. (*People v. Heitzman* (1994) 9 Cal.4th 189, 210 [37 Cal.Rptr.2d 236, 886 P.2d 1229].) These obligations are not so much for the protection of the individuals involved but for the protection of society from the burden of supporting those unable to care for themselves. The law imposes no other obligations arising out of the parent-child relationship.

Because the law imposes no criminal sanction for intentional acts of self-destruction (*Thor* v. *Superior Court* (1993) 5 Cal.4th 725, 741 [21 Cal.Rptr.2d 357, 855 P.2d 375]), recognition of a duty under the circumstances presented in this case would be tantamount to imposing a duty on parents generally to refrain from conduct which would cause emotional distress to their emancipated, adult children. For example, liability would attach to a parent who, following an automobile accident in which a family member is killed, summons an adult child to the scene to lend assistance. In our view, family relationship alone is not a sufficient basis for imposing a duty of care to refrain from negligently causing emotional distress. It is not the province of the law to enforce a code of family or parental responsibility beyond that necessary to protect society from the burden of supporting those unable to support themselves.

Defendant's conduct was morally reprehensible but not legally cognizable. As we explained in a different context: "It is the duty of the family member . . . to weigh the risk of emotional trauma against the benefit of saving a loved one's life. Having weighed that risk, the family member . . . may decline to go to the scene. But having elected to go, the relative must be prepared not only to rejoice in a rescue but to endure the emotional burden of a tragedy as well." (*Allen* v. *Toten* (1985) 172 Cal.App.3d 1079, 1091 [218 Cal.Rptr. 725] [declining to impose a duty on police officers who brought a wife to the scene of a standoff between police and her husband who was threatening suicide].) Plaintiff came to the scene of defendant's attempted suicide knowing full well his father's intentions, perhaps hoping to avert an even greater catastrophe than had already befallen the family. In that, he was successful. But his involvement in these events did not constitute him a "victim," direct or otherwise, of defendant's conduct.

## V

■ Plaintiff contends the court erred in rejecting his claim for assault and battery. He argues that while defendant may not have intended to injure him, intent is immaterial where injury results from an unlawful or wrongful act. (See *Lopez* v. *Surchia* (1952) 112 Cal.App.2d 314, 318 [246 P.2d 111].)

This is again an attack on the sufficiency of the evidence. In rejecting plaintiff's assault and battery claim, the trial court explained: "It is clear from the evidence that, from and after the time of [plaintiff's] arrival, [defendant] threatened only to harm himself. [Defendant] did not threaten [plaintiff] or [plaintiff's wife]. It is equally clear that [plaintiff] initiated the struggle over the shotgun. Commendable as his intervention may have been, the fact is that [plaintiff] approached [defendant] and initiated the physical struggle for possession of the shotgun. In fact, as [plaintiff] approached him, [defendant] backed up in order to keep [plaintiff] from approaching him. There is no evidence that [defendant] intended to harm either [plaintiff] or [plaintiff's wife]. There is no evidence that, had [plaintiff] not intervened, [defendant] would have done anything to injure anyone other than himself."

■ "A battery is any intentional, unlawful and harmful contact by one person with the person of another. . . . A harmful contact, intentionally done is the essence of a battery. . . . A contact is 'unlawful' if it is unconsented to. . . ." (*Ashcraft* v. *King* (1991) 228 Cal.App.3d 604, 611 [278 Cal.Rptr. 900], citations omitted.) The elements of a civil battery are: " '1. Defendant intentionally did an act which resulted in a harmful or offensive contact with the plaintiff's person; [¶] 2. Plaintiff did not consent to the contact; [and] [¶] 3. The harmful or offensive contact caused injury, damage, loss or harm to the plaintiff.' " (*Barouh* v. *Haberman* (1994) 26 Cal.App.4th 40, 46, fn. 4 [31 Cal.Rptr.2d 259] [quoting from BAJI No. 7.50].)

■ Assuming intent is immaterial where injury results from an unlawful or wrongful act, substantial evidence supports the trial court's implicit finding the conduct alleged to have constituted a battery was not unlawful or wrongful. The law imposes no criminal sanction for intentional acts of self-destruction. (*Thor* v. *Superior Court, supra*, 5 Cal.4th at p. 741.) In the face of the attempted suicide, plaintiff initiated the physical contact between himself and defendant. Defendant sought to avoid it. Defendant struggled with plaintiff to gain control of the shotgun in order to accomplish his goal of self-destruction. There was no intent to harm anyone other than himself. Plaintiff's assault and battery claim was properly rejected.

The judgment is affirmed.

Morrison, J., concurred.

RAYE, J., Dissenting.—This case involves civil liability for grisly family violence. An abusive father shot his wife in the face, then telephoned his adult son, who lived nearby, and told him he had murdered his mother and was about to shoot himself. When the son, accompanied by his pregnant wife, arrived a few minutes later, the father had his shotgun pointed at his head and insisted on committing suicide. The son wrestled with him for control of the shotgun. His wife sustained minor injuries when the shotgun fired. The father survived and was convicted of murder. Not surprisingly, the son suffers severe posttraumatic stress disorder. He sued his father on a variety of legal theories, all of which were ultimately rejected by the trial court.

Lamenting "the relentless march of logic," while touting the ennobling virtue of "experience," (maj. opn., *ante,* at p. 488) the majority denies plaintiff all relief, reasoning that "[h]eartache and emotional pain are an inherent staple of the parent-child relationship." [*Id.* at p. 495.) Because I find little in the rules of logic or the lessons of human experience to support the majority's views, I respectfully dissent.

The majority discerns that duty is "the crux of this matter" and duty "is a matter of policy" determinable as a question of law. (Maj. opn., *ante,* at p. 494.) And so it is. "[T]he problem of duty is as broad as the whole law of negligence." (Prosser & Keaton on Torts (5th ed. 1984) pp. 357-358.) But in performing its policy calculus, the majority does little more than recapture the angst of earlier years when claims for emotional distress were met with universal disdain. However, the policy judgments underlying recognition of emotional distress as a compensable injury have been made by the Supreme Court. We may question the clarity and wisdom of its pronouncements but the "relentless flow" of its policy judgments runs counter to the majority decision. As sympathetic as I might be with the exasperated tone of the opinion, the majority has chosen an inappropriate outlet to vent its frustration. "Enough already" is a sentiment which aptly applies to many ill-considered lawsuits appealed to this court; the current case does not warrant such a response.

Recognition of a duty between family members to refrain from the conduct of the type here at issue will not tear families asunder or lead to lawsuits by frustrated parents or homework-stressed students and, most importantly, would not be a radical departure from past articulations of duty.

To understand why this is so requires a brief historic review of the rules pertaining to negligent infliction of emotional distress (NIED).

Supreme Court decisions regarding NIED exhibit the court's profound ambivalence on the subject. There is, on the one hand, a strong recognition that emotional injury can be as disabling and life altering as physical injury, with all the attendant economic consequences that merit compensation. That recognition is tempered, however, by a fear that claims may often be trivial or fraudulent, by a lack of faith in the ability of science to distinguish legitimate from false claims, and by a similar skepticism regarding the ability of juries to calculate damages. The concern with legitimacy and quantification applies to claims for both intentional and negligent infliction. Additional concerns apply to claims for negligent infliction of emotional distress—concerns that permitting recovery for clearly legitimate emotional injury on the same terms as physical injury would expose citizens to tort liability for even innocuous behavior and overwhelm the courts with numerous and difficult cases. The court has struggled to develop principled standards for compensating the truly injured without imposing unacceptable social costs. The concept of duty has played a central role in this struggle.

Duty can be defined either in terms of risk (whether defendant's conduct posed an unreasonable risk of foreseeable injury to someone) or in terms of relationship (whether the personal relationship between defendant and plaintiff warrants imposition of a duty). Until recently, duty for purposes of NIED was defined largely in terms of risk of physical injury, and duty was found to exist only in narrowly circumscribed circumstances. Initially, recovery was only permitted when there was physical injury and emotional distress was parasitic to the injury. Later, physical impact, even without injury, provided a basis for recovery. Still later, plaintiffs within a zone of physical danger were permitted to recover. Nonetheless, in all cases, duty was effectively restricted; defendants did not owe a duty to the world at large to avoid conduct creating an unreasonable risk of inflicting emotional harm. The ambit of duty was for all intents and purposes the same as that imposed for physical injuries. However, the law recognized emotional injuries suffered by those who might otherwise be subject to physical harm. By restricting duty in such a manner, the courts greatly limited the number of potential claimants and tied recovery for emotional injury to situations more likely to result in credible claims. Duty extended only to those who were physically endangered by defendant's conduct.

The scope of duty was expanded, however, with the court's decision in *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316], which extended the range of duty beyond those at risk of

physical injury. Duty was owed to "bystanders," percipient witnesses, who are (1) closely related to a victim who suffers physical injury, (2) present at the scene, and (3) aware of the injury-producing event as it occurs. Bystander principles also reflected a concern with validating injuries by tying recover to physical injury; duty was tied to a risk of physical injury, albeit to a third party. As the majority correctly observes, the bystander cases " 'all arise in the context of physical injury or emotional distress caused by the negligent conduct of a defendant with whom the plaintiff ha[s] no preexisting relationship, and to whom the defendant had not previously assumed a duty of care beyond that owed to the public in general.' " (*Burgess v. Superior Court* (1992) 2 Cal.4th 1064, 1072-1073 [9 Cal.Rptr.2d 615, 831 P.2d 1197], italics omitted.) I concur with the majority that appellant is not among that number.

The rules were changed with the Supreme Court's decision in *Molien* v. *Kaiser Foundation Hospitals* (1990) 27 Cal.3d 916 [167 Cal.Rptr. 831,616 P.2d 813, 16 A.L.R.4th 518], which represents a doctrinal shift in the court's approach to NIED claims. There, the court rejected the need for "a screening device to minimize a presumed risk of feigned injuries and false claims." (*Id.* at p. 925.) The court extended a duty to "direct victims" based simply on the foreseeability of possible emotional distress. Physical injury, or the risk thereof, was no longer a requirement. "[T]he jurors are best situated to determine whether and to what extent the defendant's conduct caused emotional distress, by referring to their own experience." (*Id.* at p. 930.) The court soon realized that a limitation based on foreseeability was, in reality, no limit at all. " '[F]oreseeability, like light, travels indefinitely in a vacuum.' " (*Thing* v. *La Chusa* (1989) 48 Cal.3d 644, 659 [257 Cal.Rptr. 865, 771 P.2d 814].) In *Marlene F.* v. *Affiliated Psychiatric Medical Clinic* (1989) 48 Cal.3d 583 [257 Cal.Rptr. 98, 770 P.2d 278], the court quickly clarified the applicable principles, explaining that "[d]amages for severe emotional distress . . . are recoverable in a negligence action when they result from the breach of a duty owed the plaintiff that is assumed by the defendant or imposed on the defendant as a matter of law, or that arises out of a relationship between the two." (*Id.* at p. 590.) Further clarifying its holding in *Molien*, the court explained in *Burgess* v. *Superior Court, supra*, 2 Cal.4th 1064 that foreseeability is but a threshold requirement; emotional injury is actionable "in cases where a duty arising from a preexisting relationship is negligently breached." (*Id.* at p. 1074.)

Duty was thus defined not in terms of risk but in terms of a relationship. The court concluded there are some preexisting relationships that impose a duty on the parties to refrain from conduct creating a risk of *serious* emotional injury. The crux of the direct victim theory is the requirement of

a "preexisting relationship." The presence of a preexisting relationship serves both the validating function of the court's past articulations of the duty requirement and also limits the number of prospective claimants. The court explained that in bystander cases "the class of potential plaintiffs could be limitless, resulting in the imposition of liability out of all proportion to the culpability of the defendant." (*Burgess* v. *Superior Court, supra*, 2 Cal.4th at p. 1073.) The court thus circumscribed the class of bystanders to whom a defendant owes a duty. These restrictions are unnecessary where the parties have a preexisting relationship. "Rather, well-settled principles of negligence are invoked to determine whether all elements of a cause of action, including duty, are present in a given case." (*Ibid.*)

Here the trial court found plaintiff was within the class of persons having a protected interest in being free of the negligent infliction of emotional distress by his father and he had sustained emotional damages as a result of the events which occurred following his father's telephone call. The trial court's holding was proper. The parent-child relationship is a "preexisting relationship" and gives rise to a duty on a father's part to avoid severe emotional harm. The trial court denied recovery because the conduct was not outrageous. As we held in *Mercado* v. *Leong* (1996) 43 Cal.App.4th 317 [50 Cal.Rptr.2d 569], and as the majority correctly recognizes here, the outrageousness of the conduct is not an appropriate element of a negligence claim. Plaintiff, like the mothers in *Burgess* and *Mercado*, was a direct victim. The limitations on duty arise from foreseeability and policy considerations.

The Supreme Court has not undertaken to describe the nature of the preexisting relationship which gives rise to duty. Certainly, not every fleeting encounter can be characterized as a "preexisting relationship." However, we need not concern ourselves with fringe issues; there is no doubt under the facts here presented that the parties had a preexisting relationship. The majority assumes that we are free to define such duty as a matter of policy in the same manner as duty is defined in other negligence contexts. This may be so. Their policy formulation, however, fails.

The majority's analysis of duty begins with the historic concern that "where only emotional distress is claimed the degree of certainty that plaintiff suffered injury is diminished." The majority then asserts the certainty is diminished further in a family setting, where the connection between defendant's conduct and injury claimed is "necessarily suspect." In any event, we are told, one may not assume the closeness of family ties (and hence, presumably, the likelihood of emotional harm) from the existence of a parent-child relationship. Nevertheless, subjecting the "cold, impersonal

logic of the law into [the arena of family relationships] could lead to the destruction of close family relationships." Finally, the majority observes that existing statutes impose only limited duties of support on family members. In brief, the majority finds plaintiff is not entitled to protection because claims for pure emotional distress within a family setting are inherently suspect, might be contrived in dysfunctional families, and are potentially destructive of close family relationships in normal families.

Certainly, the possibility of fraudulent claims, standing alone, would not preclude a finding of duty. The Supreme Court has been mindful of that possibility and in *Dillon* even acknowledged that juries may not always sift good claims from bad. "But such fallibility, inherent in the judicial process, offers no reason for substituting for the case-by-case resolution of causes an artificial and indefensible barrier." (*Dillon* v. *Legg, supra*, 68 Cal.2d at p. 737.) Indeed, the direct victim theory of NIED, is based on the assumption that claims arising from preexisting relationships are less likely to be contrived than claims between strangers. There are few preexisting relationships less likely to produce fickle, fraudulent claims than relationships between family members. That reality is recognized in the majority's apprehension that permitting recovery might be destructive of family relationships. The concern is not that claims are likely to be contrived, but that the threshold for emotional harm is lower in the family setting. However, that must be counterbalanced by the reluctance of most families to air their private disputes in public forums. It is true that not all families are close; conduct which produces extreme anxiety in one family might only produce a yawn in another. The conduct in the present case is not of that character. Under *Molien*, recovery is permitted only for "serious" emotional harm. In any event, the question of whether defendant's conduct produced the serious emotional harm asserted by plaintiff is a question of fact for the jury, not a question of duty for us.

The majority offers various examples of stress-producing conduct between family members in an effort to explain the folly of imposing a duty on defendant in the present case. Whatever my thoughts on the hypotheticals offered by the majority, I am not persuaded that imposing a duty on the defendant to avoid exposing his adult child to horrific family violence is foolish. Certainly disputes over homework bear no relation to murder and attempted suicide. For that reason I would reverse the judgment.

A petition for a rehearing was denied December 16, 1997, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied March 18, 1998. Kennard, J., was of the opinion that the petition should be granted.