[Nos. A102706, A103925. First Dist., Div. One. Dec. 14, 2005.]

LILI BUTLER-RUPP et al., Plaintiffs and Appellants, v.
ROSEANNA LOURDEAUX et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts B–F of the Discussion.

**COUNSEL**

Reed Smith, Peter W. Davis, Kathy M. Banke and Jayne E. Fleming for Plaintiffs and Appellants.

Grant, Genovese & Baratta and Lance D. Orloff for Defendants and Appellants.

## OPINION

**SWAGER, J.**—In this litigation arising from a landlord-tenant relationship, the landlords, Roseanna Lourdeaux and Wallace Lourdeaux (hereafter the Lourdeauxs), and their property manager, Evelyn Phelan (hereafter Phelan) appeal a judgment in favor of the tenant, Lili Butler-Rupp (hereafter Butler-Rupp) and Lili Butler Studio, Inc. (hereafter referred to collectively as plaintiff). The plaintiff separately appeals from an order denying a motion for attorney fees. We affirm in part and reverse in part the judgment in favor of plaintiff and reverse the order denying plaintiff's motion for attorney fees.

## PROCEDURAL BACKGROUND

Plaintiff filed a complaint on April 10, 1998, against the Lourdeauxs and Phelan alleging breach of contract and several tort causes of action, and later added additional tort causes of action in a second amended complaint filed on July 7, 2000. At the conclusion of a lengthy trial, the court instructed the jury on seven causes of action: breach of contract, promissory fraud, negligent misrepresentation, defamation, interference with tenant's quiet enjoyment, intentional infliction of emotional distress, and negligent infliction of emotional distress.

On March 5, 2003, the jury returned a special verdict, responding to 23 questions, which found the Lourdeauxs liable on all causes of action except promissory fraud and intentional infliction of emotional distress. Phelan was found liable on causes of action for defamation, interference with tenant's quiet enjoyment, and negligent infliction of emotional distress. The jury further found that the Lourdeauxs and Phelan were liable for punitive damages predicated on the defamation verdict and a finding of oppression, malice or fraud.

The special verdict form asked for a single award of damages for the findings of liability for breach of contract, negligent misrepresentation and interference with quiet enjoyment. The jury awarded plaintiff damages of $855,000 on these causes of action. Responding to separate questions in the verdict form, the jury awarded plaintiff damages of $80,000 for defamation and $500,000 for negligent infliction of emotional distress. In a subsequent proceeding, it awarded plaintiff punitive damages against the Lourdeauxs in the amount of $5,000 and against Phelan in the amount of $500.

In postjudgment proceedings, the court denied the motion of the Lourdeauxs and Phelan for a new trial by an order filed June 19, 2003, and

denied plaintiff's motion for attorney fees by an order entered August 12, 2003. The Lourdeauxs and Phelan (hereafter appellants) filed a notice of appeal from judgment, and plaintiff filed a separate notice of appeal from the denial of the request for attorney fees. We have consolidated both appeals.

## FACTUAL BACKGROUND

Butler-Rupp is a clothes designer and manufacturer based in Sonoma County, California. After early successes as an artist, she began producing monoprints that she sold to local customers at prices appropriate for original works of art. In 1987, she leased a space of 900 square feet in the Lakeville Building in Petaluma, California, which was owned and managed by the Lourdeauxs. The initial lease was for a one-year term and called for a monthly rental of $350; the next year the rental rose to $600. In succeeding years, Butler-Rupp began to achieve a toehold in national markets and developed a line of high-end products for a national market. In 1991, she participated in her first New York fashion show and hired three employees, including an office manager, Anne Sachs.

The business continued to expand rapidly, with sales doubling for several consecutive years. In 1994, Butler-Rupp achieved gross sales of over $1 million, incorporated her business as Lili Butler Studio, Inc., and leased a showroom for the Dallas market. She added a new line of clothes called Tiger Lili and began plans for other lines, called Day Lili and Water Lili, which were targeted at different price ranges and clientele. Her staff continued to increase, reaching a high of 26 employees at one point in the 1990's.

In 1993 Butler-Rupp leased adjacent warehouse space in the Lakeville Building, designated suite 117, which she converted into a showroom and office. Her rent then rose to $1200. She testified that she agreed to lease suite 117 after receiving the assurance of Wallace Lourdeaux that he would upgrade the heating system. Lourdeaux later provided two vents to the room, but Butler-Rupp complained that the heating system still didn't work adequately.

The following year, Butler-Rupp explored the option of moving to another location since she calculated that she needed 3000–4000 square feet of production space to accommodate future business. In an effort to keep her as a tenant, Wallace Lourdeaux offered to convert a small area into a kitchen and to expand the leased area to include a bare, cement-floor warehouse space known as suite G. According to Butler-Rupp, her main concern was the adequacy of the heating system both in suite 117 and in the new suite G,

which was then unheated. As an inducement to stay in the building, Lourdeaux represented that he would repair the heating system in suite 117 and "would install a complete heating unit at his own expense" in suite G. Butler-Rupp agreed to enter into the lease on these terms. Wallace Lourdeaux then brought a lease dated March 29, 1995, bearing his signature to her office. The lease was for a five-year term and provided for the lease of two additional areas, suite G and the kitchen, for a total rental payment of $1,660 a month. Butler-Rupp testified that she made clear that she would not enter into the lease unless the deficient heating of suite 117 was "taken care of." In late August, she returned a signed copy of the lease to the Lourdeauxs after being assured that the heating system for suite 117 was "completely renovated."

About the time Butler-Rupp entered the new lease, Roseanna Lourdeaux assumed active management of the building. The next year she hired a tenant, Phelan, to serve as on-site manager. According to Butler-Rupp, her problems with the building and its management, especially with regard to heating, took a turn for the worse in the new lease term, stalling the expansion of her business and leading to the present litigation.

Phelan soon came into conflict with Butler-Rupp by engaging in the practice of walking uninvited into production areas and talking to employees. When Butler-Rupp tried to limit Phelan's contact with employees, Phelan adopted a contentious attitude toward the business, which was expressed in certain statements that will be examined later in the portion of this opinion dealing with the slander verdict.

Butler-Rupp invested in improvements to both suite 117 and suite G with the expectation that they could be converted into working spaces, but the heating problems allowed only very limited use of suite 117. In response to her complaints, Roseanna Lourdeaux repeatedly assured her that "they were working" on the problem and dispatched a series of workmen to make service calls. In December 1997, Butler-Rupp had an opportunity to talk to a heating system technician who had examined the system. He told her that he had "some bad news." The system was undersized to heat suite 117 and would never provide adequate heat. In his words, it was "a stage set."

Being unable to place production employees in unheated space, Butler-Rupp could use only a fraction of the leased space to meet the orders generated by rapidly expanding sales. Compounding these difficulties, the first six months of 1998 were marked by a series of conflicts and disputes with the Lourdeauxs and Phelan that signaled a breakdown in cooperation

and communication between the parties. In January, the Lourdeauxs issued a notice of rent increase that treated the unheated suite 117 as office space and inflated the calculation of the rent obligation by employing a disputed calculation of the square footage of the leased area. When Butler-Rupp raised objections, she was told that the increase was "nonnegotiable." She paid the increase under protest after retaining a lawyer. The building manager, Phelan, scheduled electrical maintenance that would have deprived Butler-Rupp's business of power shortly before her critical spring shipment date and continued to demand greater access to the premises. Resisting these demands, Butler-Rupp insisted on 24-hour notice for access into her premises.

Shortly after complaining to the Lourdeauxs about Phelan's management, Butler-Rupp was served with a 30-day notice of termination of her lease. She successfully opposed the notice of termination by relying on the five-year term of the lease, which was not subject to such termination, but the Lourdeauxs pursued other demands: they billed her for common area maintenance charges, though the lease did not provide for them; demanded that she pay monthly parking charges; claimed that she had fallen behind in rental payments based on another disputed interpretation of the lease; and presented her with another notice of rent increase through their attorney.

While she succeeded in meeting her 1998 spring production deadline, Butler-Rupp was forced to send a notice to all customers stating that she was unable to accept new orders. At trial she explained, "We were max'd out in production. We were using all the overtime we could possibly use. We couldn't employ any more people in that space, and we didn't have any space left to expand our production." The rapid sales growth that Butler-Rupp had earlier experienced began to level out in the late 1990's.

In April 1998 Butler-Rupp filed the original complaint in this action alleging violation of her leasehold rights. The Lourdeauxs countered by claiming that she had breached an oral contract to lease a utility closet and served her with two notices to pay rent or quit and a notice to perform covenants or quit. In July, they filed an unlawful detainer action. Recognizing that an eviction would have a devastating impact on her business, Butler-Rupp sought to negotiate a termination of her five-year lease while searching for space elsewhere. Unfortunately, she could not find a suitable space within the time deadline imposed by the Lourdeauxs and a tentative settlement unraveled.

The heating problems of suite 117 were never remedied. Early in 1999, Butler-Rupp retained a mechanical engineer, Daniel Reiter, to study the

heating system of suite 117. Reiter testified at trial that the heating equipment had the capacity to provide only about 60 percent of the heat the room needed, and the heat delivered to the unit was further diminished by uninsulated and leaky heating ducts. He measured the temperature in the room during five days in January and found that it never rose to a comfort level. On January 7th, for example, the temperature varied between 56 and 62 degrees during the day.

In 1999, Butler-Rupp continued to search for alternative space but several successive lease negotiations fell through. The unlawful detainer action eventually came up for trial, but the Lourdeauxs then dismissed the action. At trial, Butler-Rupp testified that the Lourdeauxs harassed her employees and poisoned relations with other tenants, but, despite these adverse conditions, she still managed to meet production deadlines. Ultimately, she was able to move out of the premises on January 31, 2000.

## DISCUSSION

### A. *Negligent Infliction of Emotional Distress*

Appellants' first assignment of error challenges the award of $500,000 in damages for emotional distress. The seventh cause of action in the second amended complaint alleged that Butler was "damaged by the negligent conduct of defendants . . . in that she has suffered . . . emotional distress as a direct and proximate result of such conduct." The trial court instructed the jury on negligent infliction of emotional distress pursuant to BAJI No. 12.80,[1] but did not offer a general instruction on negligence or an instruction defining the breach of a duty of care required for recovery of damages for emotional distress.

The jury was asked by question No. 19 of the special verdict form if "negligent infliction of emotional distress cause[d] damage" to Butler-Rupp, and if it answered "yes" to this question, the jury was asked by question No. 22 to determine the amount of damages suffered by Butler-Rupp that was caused by the defendants' conduct. The jury answered "yes" to question

---

[1] "The plaintiff Lili [Butler-Rupp] also seeks to recover damages based upon a claim of negligent infliction of emotional distress. The elements of such a claim are: 1. The defendant engaged in negligent conduct; 2. The plaintiff suffered serious emotional distress; 3. The defendants' negligent conduct was a cause of the serious emotional distress. Serious emotional distress is an emotional reaction which is not an abnormal response to the circumstances. It is found where a reasonable person would be unable to cope with the mental distress caused by the circumstances."

No. 19 and awarded damages of $500,000 in response to question No. 22. In other portions of the special verdict, the jury found that defendants did not intentionally inflict emotional distress on Butler-Rupp and awarded $855,000 in damages predicated on breach of contract (question No. 2), negligent misrepresentation (question No. 10) or interference with Butler-Rupp's quiet enjoyment of her lease (question No. 15).

As appellants argue, we consider that the present case is governed by *Erlich v. Menezes* (1999) 21 Cal.4th 543 [87 Cal.Rptr.2d 886, 981 P.2d 978], which reversed an award of damages for emotional distress based on breach of a contract to build a house. The decision first analyzed the award of tort damages in contract cases. Citing *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 515 [28 Cal.Rptr.2d 475, 869 P.2d 454], the court noted that "conduct amounting to a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from principles of tort law." (*Erlich v. Menezes, supra,* at p. 551; see also *Freeman & Mills, Inc. v. Belcher Oil Co.* (1995) 11 Cal.4th 85, 102 [44 Cal.Rptr.2d 420, 900 P.2d 669].) Thus, "[t]ort damages have been permitted in contract cases where a breach of duty directly causes physical injury [citation]; for breach of the covenant of good faith and fair dealing in insurance contracts [citation]; for wrongful discharge in violation of fundamental public policy [citation]; or where the contract was fraudulently induced. [Citation.] In each of these cases, the duty that gives rise to tort liability is either completely independent of the contract or arises from conduct which is both intentional and intended to harm." (*Erlich v. Menezes, supra,* at pp. 551–552.)

In the present case, the jury found that defendants did not intentionally cause emotional distress. The special verdict also precludes any claim that damages for emotional distress can be predicated on negligent misrepresentation. The jury awarded damages for emotional distress solely on the basis of a finding of negligence in response to question No. 19; the finding of negligent misrepresentation supported a distinct award of damages based on the response to question No. 10. In any event, we note that a plaintiff may not recover damages for emotional distress in an action for negligent misrepresentation where the "plaintiff's direct loss resulting from the negligent conduct of the defendant was [only] economic." (*Branch v. Homefed Bank* (1992) 6 Cal.App.4th 793, 801 [8 Cal.Rptr.2d 182].)

The question therefore becomes whether the jury's finding of negligence can support an award of damages for emotional distress on the present record. The *Erlich* decision also addresses this issue. The *Erlich* court observed emotional distress damages are not " 'available in every case in

which there is an independent cause of action founded upon negligence.' [Citation.]" (*Erlich v. Menezes, supra,* 21 Cal.4th 543, 554.) Such damages have generally been allowed where the defendant's conduct caused physical injury. For example, *Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965 [25 Cal.Rptr.2d 550, 863 P.2d 795], affirmed a judgment of damages where the plaintiffs suffered from prolonged exposure to a carcinogen. But in the absence of physical injury, the courts have never allowed recovery of damages for emotional distress arising solely from property damage or economic injury to the plaintiff. The injury suffered by the *Erlich* plaintiffs— the negligent construction of their house—did not cause physical injury and "derive[d] from an inherently economic concern." (*Erlich v. Menezes, supra,* at p. 558; see also *Lubner v. City of Los Angeles* (1996) 45 Cal.App.4th 525, 531–534 [53 Cal.Rptr.2d 24]; *Camenisch v. Superior Court* (1996) 44 Cal.App.4th 1689, 1691 [52 Cal.Rptr.2d 450]; *Merenda v. Superior Court* (1992) 3 Cal.App.4th 1, 7 [4 Cal.Rptr.2d 87], disapproved on other grounds in *Ferguson v. Lieff, Cabraser, Heimann & Bernstein* (2003) 30 Cal.4th 1037, 1053 [135 Cal.Rptr.2d 46, 69 P.3d 965].) Hence, the court found no precedent for the award of damages for emotional distress based on the finding of the defendants' negligence.

The *Erlich* holding is consistent with the economic loss rule reviewed in *Robinson Helicopter Co., Inc. v. Dana Corp.* (2004) 34 Cal.4th 979 [22 Cal.Rptr.3d 352, 102 P.3d 268].) The plaintiff, a manufacturer of helicopters, purchased a clutch mechanism from the defendant. When it discovered that the defendant had misrepresented that the clutch conformed to contract specifications, the plaintiff was required to recall all helicopters that it had sold with the faulty clutches. The jury returned a verdict for both compensatory and punitive damages. On appeal, the court considered whether the economic loss rule precluded recovery of a tort measure of damages, i.e., punitive damages. The court explained that "[t]he economic loss rule requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise." (*Id.* at p. 988.) The court held, however, that the defendant was properly found liable for intentional misrepresentation on facts independent of its breach of contract, i.e., its affirmative misrepresentation of contract compliance and affirmed the judgment for punitive damage as being predicated on this finding.

The *Erlich* decision is also consistent with decisions that have restricted the circumstances under which a plaintiff can recover damages for emotional distress under the law of negligence. (E.g., *Christensen v. Superior Court* (1991) 54 Cal.3d 868, 875 [2 Cal.Rptr.2d 79, 820 P.2d 181]; *Fluharty v.*

*Fluharty* (1997) 59 Cal.App.4th 484, 490–496 [69 Cal.Rptr.2d 244].) For example, in *Lawson v. Management Activities, Inc.* (1999) 69 Cal.App.4th 652 [81 Cal.Rptr.2d 745], a group of employees sought damages for emotional distress from the operator of a jet that had crashed close to their place of employment. The court analyzed their claim in terms of the "fundamentals of basic negligence law, that is, the ' "traditional elements of duty, breach of duty, causation, and damages[]" ' " and applied "the seven factors traditionally used by our Supreme Court to determine the existence of a duty . . . ." (*Id.* at p. 657; see *Burgess v. Superior Court* (1992) 2 Cal.4th 1064, 1079–1080 [9 Cal.Rptr.2d 615, 831 P.2d 1197].) Through this analysis, the court held that "the factors which determine duty weigh, on balance, against liability for emotional distress damages to otherwise unhurt bystanders." (*Lawson v. Management Activities, Inc., supra,* at p. 660.)

▮   Our consideration of the *Erlich* decision and related lines of authority leads to the conclusion that the award of damages for emotional distress should be reversed. The record supports a finding only that defendants negligently performed their contractual duties under the lease, thereby incurring liability for breach of contract. No physical injury to the plaintiff is shown by the record and no basis for predicating tort liability on intentional conduct of the defendants. Moreover, we do not find any breach of duty on the part of the Lourdeauxs that would support liability for infliction of emotional distress under the law of negligence. The Lourdeauxs' duties were circumscribed by their obligations under the lease and were confined to fulfilling plaintiff's contractual expectations of economic gain. The damages are therefore predicated on economic injury to plaintiff, which precludes recovery of damages for emotional distress. In our view, the affirmance of the award of damages for emotional distress would blur the distinction between contract and tort, thereby violating the policy underlying the economic loss rule. Since Butler-Rupp's damages derive solely from appellants' failure to perform their contract obligations, she can recover only in contract for the economic losses due to her disappointed contractual expectations.

We recognize that "[r]ecovery of emotional distress damages has been allowed, absent impact or physical injury, in certain specialized classes of cases. Where the negligence is of a type which will cause highly unusual as well as predictable emotional distress, recovery has been allowed." (*Branch v. Homefed Bank, supra,* 6 Cal.App.4th 793, 800 [collecting cases in point]; see, e.g., *Molien v. Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916, 930 [167 Cal.Rptr. 831, 616 P.2d 813] [negligent advice that patient had contracted syphilis resulting in distress to husband].) Plaintiff, however, has not cited this authority or identified circumstances that could give rise to such an independent duty of the defendants to avoid infliction of emotional distress.

Butler-Rupp appears to argue that appellants waived error by failing to object to her request for a jury instruction pursuant to BAJI No. 12.85 regarding recovery of damages for emotional distress resulting from substantial financial injury. We see no possibility of waiver. The instruction had doubtful relevance to Butler-Rupp's cause of action for negligent infliction of emotional distress since it was confined to financial injury caused by a defendant's intentional or reckless wrongful conduct. More importantly, "[i]nstructions requested by an adverse party 'are deemed to have been excepted to' (Code Civ. Proc., § 647) even though the complaining party made no objection thereto." (*Richardson v. Employers Liab. Assur. Corp.* (1972) 25 Cal.App.3d 232, 241 [102 Cal.Rptr. 547]; see *Lund v. San Joaquin Valley Railroad* (2003) 31 Cal.4th 1, 7 [1 Cal.Rptr. 3d 412, 71 P.3d 770]; 7 Witkin, Cal. Procedure (4th ed. 1997) Trial, § 315, p. 359.) The decisions that Butler-Rupp cites in an attempt to oppose this familiar rule are not in point. (*Agarwal v. Johnson* (1979) 25 Cal.3d 932, 950–951 [160 Cal.Rptr. 141, 603 P.2d 58] [failure to request instruction], overruled on other grounds in *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 574, fn. 4 [88 Cal.Rptr.2d 19, 981 P.2d 944]; *Carrau v. Marvin Lumber & Cedar Co.* (2001) 93 Cal.App.4th 281, 297 [112 Cal.Rptr.2d 869] [objection to form of instruction correctly stating law]; *Stevens v. Owens-Corning Fiberglas Corp.* (1996) 49 Cal.App.4th 1645, 1653 [57 Cal.Rptr.2d 525] [instruction given at appellant's request].)

Other cases on which Butler-Rupp relies are easily distinguishable. She cites *Stoiber v. Honeychuck* (1980) 101 Cal.App.3d 903 [162 Cal.Rptr. 194] as a decision allowing a tenant to recover tort damages from a landlord, but *Stoiber* applies only to landlords of residential property and has no application to commercial leases. (*Id.* at pp. 922–925.) The recovery of a tort measure of damages in *Stoiber* was predicated on the landlord's statutory duty to maintain in a tenantable condition "building[s] intended for the occupation of human beings . . . ." (Civ. Code, § 1941.) *Acadia, California, Ltd. v. Herbert* (1960) 54 Cal.2d 328 [5 Cal.Rptr. 686, 353 P.2d 294] concerned the intentional disruption of plaintiff's water supply under circumstances "closely analogous to a trespass or a nuisance in that it interfered with [their] use and enjoyment of the land . . . ." (*Id.* at p. 338.) *Rowland v. Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561] involved a personal injury action against a tenant rather than a landlord.

B.–F.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[*]See footnote, *ante*, page 1220.

## DISPOSITION

We reverse the portion of the judgment awarding damages in the sum of $500,000 for negligent infliction of emotional distress but affirm the judgment in all other respects. We reverse the order denying Butler-Rupp's motion for attorney fees and remand the case for a determination of the amount of attorney fees which plaintiff is entitled to recover from the Lourdeauxs. The parties to the appeal are to bear their own costs on appeal.

Stein, Acting P. J., and Margulies, J., concurred.